GWIN, WHITE & PRINCE, INC. *v.* HENNEFORD
ET AL.

No. 75.   Argued November 10, 1938.—Decided January 3, 1939.

*Mr. Frank S. Bayley,* with whom *Messrs. Carl E. Croson* and *Ofell H. Johnson* were on the brief, for appellant.

*Mr. R. G. Sharpe,* Assistant Attorney General of Washington, with whom *Mr. G. W. Hamilton,* Attorney General, was on the brief, for appellees.

. MR. JUSTICE STONE delivered the opinion of the Court.

This appeal raises the single question whether a Washington tax measured by the gross receipts of appellant from its business of marketing fruit shipped from Washington to the places of sale in various states and in foreign countries is a burden on interstate and foreign commerce prohibited by the commerce clause of the Federal Constitution.

Appellant, a Washington corporation licensed to do business there, brought this suit in the State Superior Court to restrain appellees, comprising the State Tax Commission, from collecting the "business activities" tax laid by Chapter 180 of Washington Laws of 1935, amending Chapter 191 of Washington Laws of 1933, on the ground that it infringes the commerce clause. By stipulation after demurrer to the bill of complaint the cause was tried and decided on the merits, upon facts stated in the complaint and certain others specified in the stipulation. Judgment of the trial court for appellees was affirmed by the Supreme Court of Washington, 193 Wash. 451; 75 P. 2d 1017, and the case comes here on appeal under § 237 (a) of the Judicial Code as amended, 28 U. S. C. § 344.

Sections 4(e), 5(g), (m) of Tit. II, c. 180 of Washington Laws of 1935 lay "a tax for the act or privilege of engaging in business activities" upon every person (including corporations) "engaging within this state in any business activity," with exceptions not now material, at the rate of one-half of 1% of the "gross income of the business." As the record discloses, appellant has a place of business in the state of Washington from which it carries on its operations in marketing, in other states and foreign countries, apples and pears grown in Washington and Oregon. Its entire business is that of marketing agent

for fruit growers and growers' coöperative organizations in those states. As such it makes sales and deliveries of the fruit in other states and in foreign countries, collects the sales prices and remits the proceeds to its principals after deducting transportation charges, certain expense allowances and its own compensation. In the course of the business the fruit is shipped from the states of origin—approximately 25% from Oregon—to other states and foreign countries, sometimes directly to the purchasers, but more often it is consigned to appellant at extra-state points from which it is diverted by appellant to purchasers who buy the fruit while in transit, or where it is stored pending sale. Representatives of appellant at numerous points without the state negotiate sales of the fruit on behalf of appellant and on its approval execute written contracts of sale, effect delivery of the shipments to purchasers, collect the purchase price and remit it to appellant in Washington, where it is accounted for to the shippers. In conducting the business appellant sends to its representatives without the state daily bulletins listing the fruit, some of which is in transit interstate and some of which has already been placed in storage without the state, and it expends large amounts for communications by telephone, telegraph and cable between itself in Washington and its representatives outside the state.

The entire Washington business is carried on by appellant under contract with an incorporated federation of twelve state coöperative growers' organizations. By this contract appellant is given exclusive authority to sell all apples and pears coming into the possession and control of the federation as agent for its members and to collect the proceeds of sale. Appellant undertakes to sell these products at prices fixed by the federation, to obtain their widest possible distribution, to attend to all traffic matters pertaining to shipment and transportation of the fruit, to effect delivery to purchasers and to collect and

remit the sales prices. The stipulated compensation for the entire service is at the rate of 8 cents a box for apples sold and 10 cents a box for pears. According to the bill of complaint appellees assert that appellant is subject to the tax upon its entire gross revenue from the business, and they threaten to collect the tax and to impose penalties for its nonpayment. But on the trial it was stipulated that "the state makes no claim" to the tax upon appellant's Oregon business, and we treat the decision and decree of the state court as concerned only with the validity of the tax measured by the amount of fruit shipped from Washington.

The Supreme Court of Washington, conceding that the shipment of the fruit from the state of origin to points outside, and its sale there, involve interstate commerce, held nevertheless that appellant's activities in Washington in promoting the commerce were a local business, subject to state taxation as is other business carried on in the state, and it sustained the present levy, against attack under the commerce clause, as a tax upon those activities, citing *Ficklen* v. *Shelby County Taxing District,* 145 U. S. 1, and *American Manufacturing Co.* v. *St. Louis,* 250 U. S. 459.

We need not stop to consider which, if any, of appellant's activities in carrying on its business are in themselves transportation of the fruit in interstate or foreign commerce. For the entire service for which the compensation is paid is in aid of the shipment and sale of merchandise in that commerce. Such services are within the protection of the commerce clause, *Robbins* v. *Shelby County Taxing District,* 120 U. S. 489; *Caldwell* v. *North Carolina,* 187 U. S. 622; *Real Silk Mills* v. *Portland,* 268 U. S. 325; and the only question is whether the taxation of appellant's gross receipts derived from them is such an interference with interstate commerce as to bring the tax within the constitutional prohibition.

While appellant is engaged in business within the state, and the state courts have sustained the tax as laid on its activities there, the interstate commerce service which it renders and for which the taxed compensation is paid is not wholly performed within the state. A substantial part of it is outside the state where sales are negotiated and written contracts of sale are executed, and where deliveries and collections are made. Both the compensation and the tax laid upon it are measured by the amount of the commerce—the number of boxes of fruit transported from Washington to purchasers elsewhere; so that the tax, though nominally imposed upon appellant's activities in Washington, by the very method of its measurement reaches the entire interstate commerce service rendered both within and without the state and burdens the commerce in direct proportion to its volume.

The constitutional effect of a tax upon gross receipts derived from participation in interstate commerce and measured by the amount or extent of the commerce itself has been so recently and fully considered by this Court that it is unnecessary now to elaborate the applicable principles. *Western Live Stock* v. *Bureau of Revenue,* 303 U. S. 250; *Adams Manufacturing Co.* v. *Storen,* 304 U. S. 307; cf. *Coverdale* v. *Arkansas-Louisiana Pipe Line Co.,* 303 U. S. 604.

It has often been recognized that "even interstate business must pay its way" by bearing its share of local tax burdens, *Postal Telegraph-Cable Co.* v. *Richmond,* 249 U. S. 252, 259, and that in consequence not every local tax laid upon gross receipts derived from participation in interstate commerce is forbidden. See *Western Live Stock* v. *Bureau of Revenue, supra,* 254 *et seq.,* and cases cited. But it is enough for present purposes that under the commerce clause, in the absence of Congressional action, state taxation, whatever its form, is precluded if it discriminates against interstate commerce or

undertakes to lay a privilege tax measured by gross receipts derived from activities in such commerce which extend beyond the territorial limits of the taxing state. Such a tax, at least when not apportioned to the activities carried on within the state, see *Maine* v. *Grand Trunk Ry. Co.*, 142 U. S. 217; *Wisconsin & M. Ry. Co.* v. *Powers*, 191 U. S. 379; *Cudahy Packing Co.* v. *Minnesota*, 246 U. S. 450; *United States Express Co.* v. *Minnesota*, 223 U. S. 335; cf. *Ficklen* v. *Shelby County Taxing District, supra; American Manufacturing Co.* v. *St. Louis, supra,* burdens the commerce in the same manner and to the same extent as if the exaction were for the privilege of engaging in interstate commerce and would, if sustained, expose it to multiple tax burdens, each measured by the entire amount of the commerce, to which local commerce is not subject.

Here the tax, measured by the entire volume of the interstate commerce in which appellant participates, is not apportioned to its activities within the state. If Washington is free to exact such a tax, other states to which the commerce extends may, with equal right, lay a tax similarly measured for the privilege of conducting within their respective territorial limits the activities there which contribute to the service. The present tax, though nominally local, thus in its practical operation discriminates against interstate commerce, since it imposes upon it, merely because interstate commerce is being done, the risk of a multiple burden to which local commerce is not exposed. *Adams Manufacturing Co.* v. *Storen, supra,* 310, 311; cf. *Fargo* v. *Michigan,* 121 U. S. 230; *Philadelphia & Southern S. S. Co.* v. *Pennsylvania,* 122 U. S. 326; *Galveston, H. & S. A. Ry. Co.* v. *Texas,* 210 U. S. 217, 225, 227; *Meyer* v. *Wells, Fargo & Co.,* 223 U. S. 298; *Crew Levick Co.* v. *Pennsylvania,* 245 U. S. 292; *Fisher's Blend Station* v. *State Tax Commission,* 297 U. S. 650; see *Western Live Stock* v. *Bureau of*

*Revenue, supra,* 260. Such a multiplication of state taxes, each measured by the volume of the commerce, would reëstablish the barriers to interstate trade which it was the object of the commerce clause to remove. Unlawfulness of the burden depends upon its nature, measured in terms of its capacity to obstruct interstate commerce, and not on the contingency that some other state may first have subjected the commerce to a like burden.

*Ficklen* v. *Shelby County Taxing District, supra,* which the Washington Supreme Court thought sustained its decision, upheld a state license tax imposed upon the privilege of doing a brokerage business within the state and measured by the gross receipts of commissions from sales of merchandise shipped into the state for delivery after the sales were made. Although the tax, measured by gross receipts, to some extent burdened the commerce, it was held that the burden did not infringe the commerce clause. Since it was apportioned exactly to the activities taxed, all of which were intrastate, the tax was fairly measured by the value of the local privilege or franchise. *New York, L. E. & W. R. Co.* v. *Pennsylvania,* 158 U. S. 431; *American Manufacturing Co.* v. *St. Louis, supra; Utah Power & Light Co.* v. *Pfost,* 286 U. S. 165; *Coverdale* v. *Arkansas-Louisiana Pipe Line Co., supra.* Neither the tax in the *Ficklen* case nor that upheld in *American Manufacturing Co.* v. *St. Louis, supra,* was open to the objection directed here to the present tax and sustained in *Adams Manufacturing Co.* v. *Storen, supra,* 311, that the tax is measured by gross receipts from activities in interstate commerce conducted both within and without the taxing state and that the exaction is of such a character that if lawful it might be laid to the fullest extent by the states in which the merchandise is sold as well as by those from which it is shipped. See *Western Live Stock* v. *Bureau of Revenue, supra,* 260.

For more than a century, since *Brown* v. *Maryland,* 12 Wheat. 419, 445, it has been recognized that under the commerce clause, Congress not acting, some protection is afforded to interstate commerce against state taxation of the privilege of engaging in it. *Webber* v. *Virginia,* 103 U. S. 344; *Telegraph Co.* v. *Texas,* 105 U. S. 460; *Robbins* v. *Shelby County Taxing District, supra; Leloup* v. *Mobile,* 127 U. S. 640; *Brennan* v. *Titusville,* 153 U. S. 289; *International Text Book Co.* v. *Pigg,* 217 U. S. 91; *Fisher's Blend Station* v. *State Tax Commission, supra; Adams Manufacturing Co.* v. *Storen, supra.* For half a century, following the decision in *Philadelphia & Southern S. S. Co.* v. *Pennsylvania,* 122 U. S. 326, it has not been doubted that state taxation of local participation in interstate commerce, measured by the entire volume of the commerce, is likewise foreclosed. During that period Congress has not seen fit to exercise its constitutional power to alter or abolish the rules thus judicially established. Instead, it has left them undisturbed, doubtless because it has appreciated the destructive consequences to the commerce of the nation if their protection were withdrawn. Meanwhile Congress has accommodated its legislation, as have the states, to these rules as an established feature of our constitutional system. There has been left to the states wide scope for taxation of those engaged in interstate commerce, extending to the instruments of that commerce, to net income derived from it, and to other forms of taxation not destructive of it. See *Western Live Stock* v. *Bureau of Revenue, supra,* 254, *et seq.,* and cases cited.

*Reversed.*

MR. JUSTICE BUTLER, concurring.

MR. JUSTICE MCREYNOLDS and I concur in the result.

Appellant is engaged exclusively in interstate commerce, a part of which is carried on in the State of Washington.

For the privilege of doing that business the state statute purports to tax its gross earnings at the rate of one-half of one per cent. The exaction is plainly repugnant to the commerce clause. *Philadelphia & Southern S. S. Co.* v. *Pennsylvania,* 122 U. S. 326. *Galveston, H. & S. A. Ry. Co.* v. *Texas,* 210 U. S. 217. *Meyer* v. *Wells, Fargo & Co.,* 223 U. S. 298, 300. *New Jersey Telephone Co.* v. *Tax Board,* 280 U. S. 338, 346. *Fisher's Blend Station* v. *Tax Comm'n,* 297 U. S. 650, 655–656. *Puget Sound Co.* v. *Tax Comm'n,* 302 U. S. 90, 94. See *Matson Navigation Co.* v. *State Board,* 297 U. S. 441, 444. Reversal appropriately may be based on citation of these decisions without more.

Mr. Justice Black, dissenting.

"Equality is the theme that runs through all the sections of the statute" [1] of the State of Washington here considered. The statute imposes a general, non-discriminatory tax—measured by gross receipts—upon all businesses operating in that State. The intended equality of the statute will become unequality by the judgment of this Court here, because appellant and all other businesses in Washington that receive income for selling Washington products in that and other States, are exempted from the tax. Appellant is exempted from past, present and future payments of this tax. Not so, however, as to past, present, or future payments by Washington businesses selling only to citizens of that State. They must bear the entire burden of the tax. Thus the judgment here, framed to prevent conjectured future, possible—not present and actual—discrimination against interstate commerce, makes of this statute with equality as its theme, an instrument of discrimination against Washington intra-state

---

[1] *Henneford* v. *Silas Mason Co.,* 300 U. S. 577, 583.

businesses. Appellant, a Washington agent or broker selling Washington products in that State and elsewhere, can now do so freed from this business tax. Washington agents and brokers selling the same products to Washington citizens (and all other local businesses) must pay. Washington's intra-state commerce thus will "pay its way" [2]; interstate commerce need not.

In 1933, Washington's system of taxation failed to supply adequate revenue to support activities essential to the welfare of its people. Mounting delinquencies due to burdensome taxes on property led the state legislature to conclude that property taxes had to be reduced. This reduction was made. Then, forced to seek new sources of revenue,[3] the State turned—as did many other States faced with similar needs [4]—to a general, non-discriminatory excise tax upon business carried on in Washington, measured by gross receipts. This general and non-discriminatory tax enabled "the common schools of the state . . . to operate the full school term." [5] While those engaged in interstate businesses have enjoyed the property tax reduction in common with all Washington businesses, the exemption from taxation here granted appellant forces intra-state businesses to bear the entire burden of the

[2] Cf. *Postal Telegraph-Cable Co.* v. *Richmond*, 249 U. S. 252, 259.

[3] Fifth Biennial Report, Tax Commission of Washington; "The Sales Tax in the American States," Haig & Shoup (1934), p. 309 *et seq.*

[4] At least eleven States—most of them recently—have imposed gross income or gross sales taxes upon the privilege of doing business within their respective borders. See, "Tax Systems of the World," 7th ed. (CCH), pp. 153 to 156. While these laws vary in application, several may be generally characterized as similar to the Washington tax. See, "State Law Index" No. 5, p. 673 (Legislative Reference Service, Library of Congress); Fifth Biennial Report, *supra;* dissent, *Adams Manufacturing Co.* v. *Storen*, 304 U. S. 307, 317, footnote 4.

[5] Fifth Biennial Report, *supra*, p. 8.

excise that replaced the repealed property taxes.[6]  Only intra-state business is required to contribute under this excise to the support of the state government that affords protection to both interstate and local business.[7]

Appellant, a Washington corporation, serves—under a contract made in Washington—as sales agent for Washington apple growers.  Its agents sell these Washington-grown apples in Washington and other States.  The Washington excise tax is measured by appellant's gross income—received in Washington—and earned solely by selling apples grown in and shipped from that State.[8]

No other State in which appellant's agents perform sales services has imposed a similar tax upon appellant measured by any part of its gross receipts.  Such an eventuality—if it should occur—is given the title of "multiple taxation."  And such conjectured "multiple taxation" would be—it is said—a violation of that Clause of the Constitution which gives Congress power to regulate commerce among the States.  Thus far, Congress has not deemed it necessary to prohibit the States from

---

[6] Cf. *Cudahy Packing Co.* v. *Minnesota*, 246 U. S. 450, 453, 454; *United States Express Co.* v. *Minnesota*, 223 U. S. 335, 345, 347.

[7] *Woodruff* v. *Parham*, 8 Wall. 123, 137.

[8] While about 25% of appellant's business relates to the sale of Oregon-grown apples, the State of Washington made no contention that it could under its statute impose a tax upon appellant's receipts from the sale of Oregon-grown apples.  The judgment of the State court from which appeal was taken expressly states: "the court . . . considered . . . the stipulation between the parties that the state makes no claim to the tax upon the Oregon business of . . . [appellant] even though it clears through . . . [appellant's] Seattle office," and was "of the opinion that the business of . . . [appellant], *originating in the State of Washington, is taxable.*" (Italics supplied.) In affirming this judgment the Supreme Court of Washington pointed out that appellant was denying "the state tax commission's claim of a tax liability on the total commission appellant receives *from the growers for Washington-grown food sold and shipped to parts within and without this state . . .*" (Italics supplied.)

levying taxes measured by gross receipts from interstate commerce. While there are strong logical grounds upon which this Court has based its invalidation of state laws actually imposing unjust, unfair, and discriminatory burdens against interstate commerce as such,[9] the same grounds do not support a judicial regulation designed to protect commerce from validly enacted non-discriminatory state taxes which do not—but may sometime— prove burdensome. With reference to the possible invalidity of another phase of this same Washington tax program by reason of conjectured future taxes of other States, this Court has said: [10]

"A state, for many purposes, is to be reckoned as a self-contained unit, which may frame its own system of burdens and exemptions without heeding systems elsewhere. If there are limits to that power, there is no need to mark them now. It will be time enough to mark them when a taxpayer paying in the state of origin is compelled to pay again in the state of destination."

So here, if national regulation to prevent "multiple taxation" is within the constitutional power of this Court, it would seem to be time enough to consider it when appellant or some other taxpayer is actually subjected to "multiple taxation."

Unless we presuppose that the conjectured tax on appellant's gross income by another State would be valid, appellant has not even shown a hypothetical possibility of injury. Certainly, Washington's law, enjoying a strong presumption of constitutionality, would not be invalidated because of apprehension that another State might lay a tax on appellant's income which is invalid and unenforceable. Any other state's tax on appellant which

---

[9] *Welton* v. *Missouri*, 91 U. S. 275; *Walling* v. *Michigan*, 116 U. S. 446; *Darnell & Son Co.* v. *Memphis*, 208 U. S. 113; cf. *Philadelphia & Southern S. S. Co.* v. *Pennsylvania*, 122 U. S. 326, 342, 344–5.

[10] *Henneford* v. *Silas Mason Co.*, *supra*, at 587.

directly discriminates against interstate commerce, could not (together with Washington's tax) create a "multiple burden." This is so, because such a discriminatory tax law, standing alone, would be held to violate the Commerce Clause.[11] Every State has the right ·to utilize gross receipts as the measure of taxes which it has the power to impose.[12] Washington—it is admitted—had the power to tax appellant save for the possibility of "multiple taxation." Since "multiple taxation" can only result if another State passes a valid, non-discriminatory tax law, two non-discriminatory state laws when combined become invalid and discriminatory under the Commerce Clause, as a result of the judgment here. This is the consequence of departing from the sound position that state laws are not invalid under the Commerce Clause unless they actually discriminate against interstate commerce or conflict with a regulation enacted by Congress.

Appellant is here specifically exempted from Washington's non-discriminatory "tax for the act or privilege of engaging in business activities" in Washington because of conjectured similar taxation of appellant in| other States. However, the principles announced in the first three cases relied on by the majority[13] would constitute authority for exempting appellant's agents from a tax on the privilege of engaging in the business of selling and delivering apples "in other States to which [appellant's] commerce extends." These principles were there applied by this Court to invalidate taxes on the privilege of negotiating interstate sales, levied by States in which the purchasers resided. In one of the cases (*Caldwell* v. *North*

---

[11] See Note 9, *supra;* cf. *Sonneborn Bros.* v. *Cureton,* 262 U. S. 506, 516; *Pacific Co.* v. *Johnson,* 285 U. S. 480, 493.

[12] *New York Rapid Transit Corp.* v. *New York,* 303 U. S. 573, 582.

[13] *Robbins* v. *Shelby County Taxing District,* 120 U. S. 489; *Caldwell* v. *North Carolina,* 187 U. S. 622; *Real Silk Mills* v. *Portland,* 268 U. S. 325.

*Carolina,* decided in 1903), this Court observed (pp. 632–3) "that efforts to control commerce of this kind, in the interest of the States *where the purchasers reside,* have been frequently made in the form of statutes and municipal ordinances, but . . . such efforts have been heretofore rendered fruitless by the supervising action of this court." (Italics supplied.) The reasoning of these three cases, however, does not support the judgment here which invalidates a privilege tax levied, not by the State where the apples were purchased, but by the State where the apples were grown, where the appellant does business, and to which all proceeds from sales made by appellant are remitted. This is especially true since the three earlier decisions assumed that a privilege tax imposed by an interstate business's State of residence (such as this Washington tax on appellant) would be valid. In *Robbins* v. *Shelby County Taxing District, supra,* at page 498, the Court—in explaining that the levy by the State of purchase of a tax on the privilege of selling would discriminate against out of state businesses—said: "it is presumable, . . . [that] the merchants and manufacturers of other states in the places where they reside" are taxed for their licensed businesses there. In showing that "the tax . . . [was] discriminative against the merchants and manufacturers of other states" the Court also stated that ". . . it not only operates as a restriction upon interstate commerce, but . . . it is intended to have that effect as one of its principal objects." Appellant's business is exempted here from a privilege tax in its State of residence, and approval is given authorities exempting such business from privilege taxes in other States where appellant's activities are carried on. Thus, these three cases stand between appellant and conjectured "multiple taxation" in other States where its agents sell apples. The exemption of interstate business from the type of state taxation here involved is now made complete.

A business engaging in activities in two or more States should bear its part of the tax burdens of each. If valid, non-discriminatory taxes imposed in these States create "multiple" burdens, such "burdens" result from the political subdivisions created by our form of government. They are the price paid for governmental protection and maintenance in all States where the taxpayer does business. A State's taxes are not discriminatory if the State treats those engaged in interstate and intra-state business with equality and justice. If the combined valid and non-discriminatory taxes of many States raise a problem, only Congress has power to consider that problem and to regulate with respect to it. Neither a State, nor a State with the approval of this Court, has the constitutional power to enact rules to adjust and govern conflicting state interests in interstate commerce.

Legislative inquiry might disclose to Congress that the speculative danger of injury to interstate commerce is more than offset by the certain injury to result from depriving States of a practical method of taxation. It might appear to Congress that the adoption of a rule against state taxes measured by interstate commerce gross receipts would deprive the States of a potent weapon useful in preventing evasion of state taxes.

This Court's rule would permit Washington to tax appellant's net income. But determination and collection of taxes on net incomes are often very difficult because corporate profits and income may be isolated or hidden by accounting methods, holding companies and intercorporate dealings. A substantial portion of the nation's commerce is carried on by corporations with far-flung business activities in many States. Inter-corporate relations may assume "their rather cumbersome and involved nature for the purpose of evading [a State] . . . tax" on income and to "remove income from the state though still creating

it within the state." [14]   Even "profits themselves are not susceptible of ascertainment with certainty and precision except as the result of inquiries too minute to be practicable." [15]

Congress might conclude that the States should not be prohibited from utilizing non-discriminatory gross receipts taxes for state revenues, because there are "justifications for the gross receipts tax. . . . it has greater certitude and facility of administration than the net income tax, an important consideration to taxpayer and tax gatherer alike.  And the volume of transactions indicated on the taxpayer's books may bear a closer relation to the cost of governmental supervision and protection than the annual profit and loss statement." [16]

Only a comprehensive survey and investigation of the entire national economy—which Congress alone has power and facilities to make—can indicate the need for, as well as justify, restricting the taxing power of a State so as to provide against conjectured taxation by more than one State on identical income.  A broad and deliberate legislative investigation—which no Court can make—may indicate to Congress that a wise policy for the national economy demands that each State in which an interstate business operates be permitted to apply a non-discrimi-

---

[14] *Palmolive Co.* v. *Conway,* 43 F. 2d 226, 230, cert. den., 287 U. S. 601; see Magill "Allocation of Income by Corporate Contract," 44 Harvard Law Review 935; "Interstate Allocation of Corporate Income for Taxing Purposes" (note) XL Yale Law Review 1273; Huston "Allocation of Corporate Net Income for Purposes of Taxation," XXVI Ill. Law Review 725; Breckenridge, "Tax Escape by Manipulations of Holding Company," 9 No. Car. Law Review 189; Berle and Means, "The Modern Corporation and Private Property" (1934), p. 202 *et seq.*

[15] Cardozo, J., dissenting, *Stewart Dry Goods Co.* v. *Lewis,* 294 U. S. 550, 576.

[16] *New York Rapid Transit Corp.* v. *New York, supra,* 582–3.

natory tax to the gross receipts of that business either because of its size and volume or partially to offset the tendency toward centralization of the nation's business.[17] Congress may find that to shelter interstate commerce in a tax exempt refuge—in the manner of the judgment here —is to grant that commerce a privileged status over intrastate business, contrary to the national welfare.

It is indicated, however, that Washington might have validly apportioned its fair share of appellant's gross income for taxation. To say that a single State can—subject to supervision and approval by this Court—enact regulations apportioning its share of the taxable income from interstate commerce, is to transfer the constitutional power to regulate such commerce from Congress to the States and federal courts to which the Constitution gives no such power. The Constitution contemplates that Congress alone shall provide for necessary national uniformity in rules governing foreign and interstate commerce.[18] Rules to further free trade among the States by apportionment or division of taxes on such commerce, are regulations. Both the necessity for such a rule, and the determination and enactment of a regulation to put it into effect, call for facilities and powers possessed neither by a State nor by the courts. A state legislature attempting to put upon interstate business its apportioned share of

---

[17] Cf. Brandeis, J., dissenting, *Liggett Co.* v. *Lee*, 288 U. S. 517, 574: "Businesses may become as harmful to the community by excessive size, as by monopoly or the commonly recognized restraints of trade. If the State should conclude that bigness in retail merchandising as manifested in corporate chain stores menaces the public welfare, it might prohibit the excessive size or extent of that business . . . It was said in *United States* v. *U. S. Steel Corp.*, 251 U. S. 417, 451, that the Sherman Anti-Trust Act did not forbid large aggregations; but the power of Congress to prohibit corporations of a size deemed excessive from engaging in interstate commerce was not questioned."

[18] *Welton* v. *Missouri, supra,* 279, 280.

the burden of taxation is "faced with the impossibility of allocating specifically the profits earned by the processes conducted within" the borders of the State.[19]  If an "apportionment" between States of taxes on interstate business is to be made, it cannot be accomplished without national inquiry and national action.

While some formulas for apportionment devised by States have been approved by this Court,[20] others have been invalidated.[21]  A formula applied by Connecticut was held valid,[22] but a similar formula was held invalid when adopted in North Carolina.[23]  The litigation which has followed in the wake of state attempts at apportionment has confirmed, in the opinion of many, the wisdom of the Founders in denying to the States and courts, and granting to the Congress, exclusive power over interstate commerce.  Departures from this principle have, as here, left intra-state businesses—usually comparatively small— to bear the entire burden of taxes invalidated as to interstate businesses, while interstate businesses—usually conducted on a large scale—have been exempted. Should Washington attempt an apportionment, the fate of its formula would be uncertain until this Court passes upon its fairness.  A state's inability to obtain necessary data and information as a basis of a formula for apportionment between itself and the other forty-seven States, indicates in advance that its apportionment might be invalidated.  When state statutes of apportionment come

[19] *Underwood Typewriter Co.* v. *Chamberlain,* 254 U. S. 113, 121.

[20] *Underwood Typewriter Co.* v. *Chamberlain, supra; Bass, Ratcliff & Gretton* v. *Tax Comm'n,* 266 U. S. 271; cf. *National Leather Co.* v. *Massachusetts,* 277 U. S. 413.

[21] *Hans Rees' Sons* v. *North Carolina,* 283 U. S. 123; cf. *Wallace* v. *Hines,* 253 U. S. 66; *Alpha Portland Cement Co.* v. *Massachusetts,* 268 U. S. 203.

[22] *Underwood* case, *supra.*

[23] *Rees'* case, *supra.*

here this Court is unable to make the broad national inquiry necessary to reach an informed conclusion on this question of economic policy.

But Congress has both the facilities for acquiring the necessary data, and the constitutional power to act upon it. "The power over commerce . . . was one of the primary objects for which the people of America adopted their government, and must have been contemplated in forming it." [24] The "disastrous experiences under the Confederation when the States vied in discriminatory measures against each other" [25] united the Constitutional Convention in the conviction that some branch of the Federal Government should have exclusive power to regulate commerce among the States and with foreign nations. Our Constitution adopted by that Convention divided the powers of government between three departments, Congress, the Executive and the Judiciary. It allotted to Congress alone the "Power . . . to regulate Commerce with foreign Nations, and among the several States, . . ." Congress is the only department of our government—state or federal—vested with authority to determine whether "multiple taxation" is injurious to the national economy; whether national regulations for division of taxes measured by interstate commerce gross receipts should or should not be adopted; and what regulations, if any, should protect interstate commerce from "multiple taxation." It "is the function of this court to interpret and apply the law already en-

[24] *Gibbons* v. *Ogden*, 9 Wheat. 1, 190.

[25] *The Minnesota Rate Cases*, 230 U. S. 352, 398. See also *Houston, E. & W. T. Ry. Co.* v. *United States*, (*The Shreveport Case*), 234 U. S. 342, 350. "The power to regulate commerce among the several States was vested in Congress in order to secure equality and freedom in commercial intercourse against discriminating State legislation. . . ." *Railroad Co.* v. *Richmond*, 19 Wall. 584, 589. See also, *County of Mobile* v. *Kimball*, 102 U. S. 691, 697.

acted, but not under the guise of construction to provide a more comprehensive scheme of regulation than Congress has decided upon. Nor, in the absence of Federal action, may we deny effect to the laws of the State enacted within the field which it is entitled to occupy until its authority is limited through the exertion by Congress of its paramount constitutional power." [26]

Until 1936,[27] this Court had never stricken down—as violating the Commerce Clause—a uniform and non-discriminatory state privilege tax measured by gross receipts, and constituting an integral element of a comprehensive state tax program. In *Philadelphia & Southern S. S. Co.* v. *Pennsylvania,* 122 U. S. 326, decided half a century ago and relied upon to support the judgment here, this Court did not determine that such a general business tax—applied to all businesses within a State—could not be measured by interstate commerce gross receipts. On the contrary, the Court pointed out that the invalidated tax was "a tax on transportation only" (p. 345), and that even one engaged in transportation could "like any other citizen, . . . be personally taxed for the amount of his property or estate, without regard to the source from which it was derived, whether from commerce, or banking, or any other employment." That, as the Court made clear, was "an entirely different thing from laying a special tax upon his receipts in a particular employment." (p. 342.) Since the *Philadelphia S. S. Co.* case, this Court has sustained many state taxes measured by receipts both from interstate and intra-state commerce.[28] It was not until the decisions in the cases of *Crew Levick Co.* v. *Pennsylvania,* 245 U. S. 292, 296, and *United States*

---

[26] *The Minnesota Rate Cases, supra,* 433.

[27] *Fisher's Blend Station* v. *Tax Comm'n,* 297 U. S. 650, see *Adams Manufacturing Co.* v. *Storen,* 304 U. S. 307.

[28] See notes 17, 18 and 19, dissent, *Adams Manufacturing Co.* v. *Storen, supra,* p. 329.

*Glue Co.* v. *Oak Creek,* 247 U. S. 321, 329, decided 1917 and 1918, respectively, that this Court first tentatively announced, by way of dicta, a rule condemning state taxes based on gross receipts from interstate commerce. The full-blown rule under which the federal courts strike down generally applied non-discriminatory state taxes measured by gross receipts from interstate commerce ripened into its present expanded form only eight months ago (*Adams Manufacturing Co.* v. *Storen,* May 16, 1938). This recent judicial restriction—still less than a year old—on the power of the States to levy general gross receipts taxes, cannot be justified or validated by claiming prestige from advanced age.

Since the Constitution grants sole and exclusive power to Congress to regulate commerce among the States, repeated assumption of this power by the courts—even over a long period of years—could not make this assumption of power constitutional. April 25, 1938, this Court overruled and renounced an unconstitutional assumption of power by the federal courts based on a doctrine extending back through an unbroken line of authority to 1842.[29] In overruling, it was said: "We merely declare that in applying the doctrine [declared unconstitutional] this Court and the lower courts have invaded rights which in our opinion are reserved by the Constitution to the several States." (at page 80.) A century old rule had produced "injustice and confusion" and "the unconstitutionality of the course pursued . . . [had become] clear . . ." (pp. 77, 78.) That decision rested upon the sound principle that the rule of stare decisis cannot confer powers upon the courts which the inexorable command of the Constitution says they shall not have. State obedience to an unconstitutional assumption of power by the judicial branch of government,

---

[29] *Erie R. Co.* v. *Tompkins,* 304 U. S. 64.

and inaction by the Congress, cannot amend the Constitution by creating and establishing a new "feature of our constitutional system." No provision of the Constitution authorizes its amendment in this manner.

It is essential today, as at the time of the adoption of the Constitution, that commerce among the States and with foreign nations be left free from discriminatory and retaliatory burdens imposed by the States. It is of equal importance, however, that the judicial department of our government scrupulously observe its constitutional limitations and that Congress alone should adopt a broad national policy of regulation—if otherwise valid state laws combine to hamper the free flow of commerce. Doubtless, much confusion would be avoided if the courts would refrain from restricting the enforcement of valid, non-discriminatory state tax laws. Any belief that Congress has failed to take cognizance of the problems of conjectured "multiple taxation" or "apportionment" by exerting its exclusive power over interstate commerce, is an inadequate reason for the judicial branch of government—without constitutional power—to attempt to perform the duty constitutionally reposed in Congress. I would return to the rule that—except for state acts designed to impose discriminatory burdens on interstate commerce because it *is* interstate—Congress alone must "determine how far [interstate commerce] . . . shall be free and untrammelled, how far it shall be burdened by duties and imposts, and how far it shall be prohibited." [30]

For these and other reasons set out elsewhere [31] I believe the judgment of the Supreme Court of Washington should be affirmed.

[30] *Welton* v. *Missouri, supra,* 280.

[31] See dissent, *Adams Mfg. Co.* v. *Storen,* 304 U. S. 307, 316.