**In re NEW YORK, O. & W. RY. CO.**

**GEBHARDT et al. v. CITY OF NEW YORK.**

No. 88, Docket 20361.

Circuit Court of Appeals, Second Circuit.
May 7, 1947.

See also 59 F.Supp. 863; 151 F.2d 802.

Elbert N. Oakes, of New York City, for trustees-appellants.

John J. Bennett, Corp. Counsel, of New York City (Isaac C. Donner and Bernard· H. Sherris, both of New York City, of counsel), for respondent-appellant.

Before SWAN, AUGUSTUS N. HAND and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

On May 20, 1937, the debtor, New York, Ontario and Western Railway Company, filed a petition in the District Court for reorganization under Section 77 of Chapter VIII of the Bankruptcy Act, 11 U.S.C.A. § 205. Pursuant to the usual notice to creditors, the City of New York, on August 31, 1937, filed a proof of claim against the debtor for taxes on income which had accrued prior to the institution ·of the proceeding. The District Court referred the claim of the City to a Special Master and later confirmed his report.

The tax on which the proof of claim was based was imposed by the City on public utilities under authority of an enactment of the New York Legislature for the privilege of exercising a corporate franchise, or of holding property, or of doing business in the City during specified periods, to be measured by gross income. The applicable

general and local laws providing for such taxes as embodied in findings 3 and 4 of the Special Master are referred to in the margin.[1]

13. On August 29, 1933 there was enacted by the State of New York the first emergency relief tax enabling act, Laws 1933, Chapter 815. This act authorized New York City from September 1, 1933 to February 28, 1934, to impose "in any such city any tax which the legislature has or would have power and authority to impose."

On April 25, 1934 there was enacted a further enabling act, Laws 1934, Chapter 302, which authorized the City of New York from April 25, 1934 to December 31, 1934 to impose in such city any tax which the legislature has or would have power and authority to impose.

On August 18, 1934 there was enacted Chapter 873 of the Laws of 1934, which continued the enabling legislation to December 31, 1935.

On April 29, 1935, Chapter 873 of the Laws of 1934 was amended by Laws 1935, Chapter 601, to extend the enabling legislation until July 1, 1935, and on May 3, 1936, Chapter 873 of the Laws of 1934 was again amended by Laws 1936, Chapter 414, to extend the enabling legislation to July 1, 1937.

Each of the above acts provided the following:

"A tax imposed hereunder shall have application only within the territorial limits of any such city and shall be in addition to any and all other taxes.

"This act shall not authorize the imposition of a tax on any transaction originating and/or consummated outside of the territorial limits of any such city, notwithstanding that some act be necessarily performed with respect to such transaction within such limits."

Chapter 302 of the Laws of 1934, and each of the above acts enacted subsequent thereto contained the following provision:

"Provided, however, that nothing herein contained shall limit or prevent the imposition of a tax on gross income or a tax on gross receipts of persons, firms and corporations doing business in any such city. No such person, firm or corporation, however, shall be subjected to the imposition of more than one tax by any such city on gross income or gross receipts under the provisions of this act."

4. On October 14, 1933 there was enacted by the City of New York under the first enabling act (Laws 1933, Chapter 815), the first utility tax law, Local Law No. 19 of 1933, p. 127. This local law imposed an excise tax or license fee on every public utility "for the privilege of exercising its corporate franchise, or of holding property, or of doing business in the city of New York, during the period commencing September first, nineteen hundred thirty-three and ending February twenty-eighth, nineteen hundred thirty-four." The tax was 1 1/2% of the gross income defined as "that part of the gross revenues, without deduction whatsoever, of the business of such corporations, * * * derived from such business which is conducted wholly within the territorial limits of the city of New York."

This law also contained a provision, as in Chapter 815 of the Laws of 1933, that it should not authorize the imposition of a tax on any transaction originating and/or consummated outside of the territorial limits of the City of New York, notwithstanding that some act be necessarily performed with respect to such transaction within such limits.

On June 7, 1934 there was enacted Local Law No. 10 of 1934, p. 115, which imposed an excise tax on every public utility "for the privilege of exercising its franchise or franchises, or of holding property, or of doing business in the city of New York, for the balance of the calendar year nineteen hundred thirty-four," at the rate of 1 1/2% of its gross income for the period March 1, 1934 to December 31, 1934. This and subsequent local laws did not contain the provision set forth in Local Law No. 19 of 1933, p. 127, with reference to transactions originating and/or consummated outside of the territorial limits of the city, but Section 16 of this law provided that it was enacted pursuant to the provisions of Chapter 302 of the Laws of 1934 of the State of New York and should be construed in conformity therewith.

On December 5, 1934 there was enacted Local Law No. 21 of 1934, p. 151, extending the tax at the rate of 3% of "gross income" to the entire calendar year 1935. Instead of the general language used in the two earlier laws, the words "gross income" were specifically defined as follows:

"The words 'gross income' shall be deemed to refer to and include receipts received in or by reason of any sale made (except the sale of real property) or service rendered in the City of New York, including cash, credits and property of any kind or nature (whether or not such sale is made or such service is rendered for profit) without any deduction therefrom on account of the cost of the property sold, the cost of materials used, labor or services or other costs, interest or

The trustees of the debtor appeal from the allowance of taxes: (1) on income received by the debtor from demurrage; (2) on interest derived from bonds of three wholly owned subsidiaries of the debtor; (3) on interest derived from a note of Scranton Coal Company, a subsidiary of the debtor; (4) on income accrued between March 1, 1934, and April 25, 1934.

The City appeals from the disallowance of taxes upon interest received by the debtor upon its deposits in banks outside of the City of New York.

The order of the District Court should be affirmed as to the items embraced in the appeal by the trustees of the debtor, and reversed as to the item involved in the appeal by the City of New York.

## 1.

### Demurrage.

The trustees objected to a tax by the City of New York on demurrage revenue of the debtor on the ground that the demurrage was a part of its transportation revenue, not subject to tax under the enabling acts of the State of New York, and that the tax imposed a burden upon interstate commerce.

The Special Master made the following findings as to demurrage which have not been questioned by either party:

"All of said demurrage receipts were earned by the Debtor pursuant to the provisions of demurrage tariffs duly filed with the Interstate Commerce Commission and the Public Service Commission of the State of New York throughout the entire taxing period in question. All of said receipts arose and were received by the Debtor solely by reason of the delay or failure of the consignees of carload shipments of merchandise to unload said cars, destined from without to points within the City of New York.

"Said carload shipments out of which the demurrage receipts arose originated upon lines of railroad connecting with the lines of the Debtor and to some extent originated upon the lines of the Debtor in the States of Pennsylvania and New York, and in all respects were tranported thence by the Debtor over its lines of railroad through the State of New York and thence to Weehawken, in the State of New Jersey, where the same were floated to destination in the City of New York and there delivered to their respective consignees. The obligation to unload said shipments rested solely with the consignees. All of said demurrage revenue in the case of each carload shipment accrued to or was earned by the Debtor prior to the unloading of said car and its release by the consignee to the Debtor.

"After the shipments had come to rest at the terminals of independent companies (like Bush Terminal Company in Brooklyn, New York), demurrage charges were made to the consignees by the terminal company, which remitted part of the charges to the Debtor and retained part of the charges for its services."

discount paid, or any other expense whatsoever; also profits from the sale of securities; also profits from the sale of real property growing out of the ownership or use of/or interest in such property; also profit from the sale of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the period for which a return is made); also receipts from interest, dividends, rents and royalties without any deductions therefrom for any expenses whatsoever incurred in connection with the receipt thereof, and also gains or profits from any source whatsoever."

Section 15 of this law provided that it should be construed in conformity with Chapter 873 of the Laws of 1934, pursuant to which it was enacted.

Local Law No. 2 of 1935, p. 94, was enacted on February 27, 1935 covering the same calendar year 1935, which amended Local Law No. 21 of 1934, p. 151, by striking out the word "rents" in the definition of the words "gross income."

On December 4, 1935, Local Law No. 30 of 1935, p. 157, was enacted extending the tax at the 3% rate to June 30, 1936 and providing that such law should be construed in conformity with Chapter 873 of the Laws of 1934, as amended by Chapter 601 of the Laws of 1935, pursuant to which the local law was enacted.

On June 9, 1936 Local Law No. 30 of 1936, p. 137, was enacted which extended the tax at the 3% rate to June 30, 1937 and provided that the law should be construed in conformity with Chapter 873 of the Laws of 1934, as amended by Chapter 601 of the Laws of 1935 and Chapter 414 of the Laws of 1936, pursuant to which the local law was enacted.

522

We think it clear from the decisions of the Supreme Court that the inclusion of the demurrage charges in the gross income of the debtor on which the City levied a tax was not an unlawful burden on interstate commerce. In its decision in Independent Warehouses, Inc., v. Scheele, 67 S.Ct. 1062, 1073, that court dealt with a situation closely analogous to the one before us in the case at bar. There coal moving from Pennsylvania to New York via the Erie Railroad was deposited in New Jersey with Independent Warehouses, Inc., a warehouse subsidiary of the Erie, with which the latter had an arrangement for storage pending transit from Pennsylvania to points in New Jersey and New York. A license tax imposed by New Jersey on the Warehouse Company for storing the coal was held valid. Justice Frankfurter in a concurring opinion said that:

"The fact that for railroad-rate purposes this storage was treated as part of a transit privilege does not affect the relation of the storage to the taxing powers of the State. Assuming that such a storage may properly be treated as a stop-over privilege under the Interstate Commerce Act, it does not follow that the break in the process of interstate transportation is not of such significance in its relation to a State as to allow that State to tax the protection given to the property during the break as well as the opportunity afforded in conducting the business for such separable and enduring storage in the State."

In the case at bar the right of New York to tax demurrage charges which arose after the carload shipments had reached New York City and had remained for forty-eight hours unloaded by the consignees having the obligation to unload, seems even clearer than that of the State of New Jersey in Independent Warehouses, Inc., v. Scheele, supra. Here the tax was laid on property that had come to rest in the taxing state finally, while in Independant Warehouses, Inc., v. Scheele, the property was only in New Jersey during an interruption of transit. Compare also Gwin v. Henneford, 305 U.S. 434, 438, 59 S.Ct. 325, 83 L.Ed. 272.

■ The trustees' contention that the tax on demurrage was forbidden by the decision of the Supreme Court in Puget Sound Stevedoring Co. v. State Tax Comm., 302 U. S. 90, 58 S.Ct. 72, 74, 82 L.Ed. 68, is unwarranted. There a tax laid by the State of Washington on the business of an independent stevedoring company was held to be an unreasonable burden on foreign or interstate commerce because imposed on a necessary factor "if transportation is to be accomplished without unreasonable impediments." Demurrage charges here were not necessary and only arose from a failure of the consignees to take their property from the cars within forty-eight hours. This item was rightly included among those on which the New York City Franchise Tax was assessed because it represented charges for storage of merchandise within the City of New York for substantial periods of time after such breaks "in the process of transportation" as to require state protection of the carload shipments. The authority of Puget Sound Stevedoring Co. v. State Tax Comm. was reaffirmed by the Supreme Court in Joseph v. Carter & Weekes Stevedoring Co., 67 S.Ct. 815, on the ground that the New York City Franchise Tax involved in the last mentioned case, having been levied on the gross income from the business of stevedoring within the City was invalid as a tax upon a continuation of transportation and as a direct tax on commerce itself.

■ The trustees further erroneously argue that the tax is in contravention of the following provisions of the New York Enabling Acts:

"A tax imposed hereunder shall have application only within the territorial limits of any such city and shall be in addition to any and all other taxes.

"This act shall not authorize the imposition of a tax on any transaction originating and/or consummated outside of the territorial limits of any such city, notwithstanding that some act be necessarily performed with respect to such transaction within such limits."

The demurrage represents a service apart from transportation and originates and is consummated within the limits of New York City. The tax is upon the debtor's privilege of doing business therein and not upon a transaction of transportation in interstate commerce.

## 2.

*Interest Derived from Three Railroad Subsidiaries.*

The Special Master made the following findings:

"The Ellenville and Kingston Railroad Company, the Port Jervis, Monticello and Summitville Railroad Company and the Ontario, Carbondale and Scranton Railway Company are wholly-owned subsidiaries of the debtor. * * * All their outstanding stock and bonds are owned by the debtor and have been so owned since the time of the creation of these companies many years ago. * * * They and each of them are operated as part of the debtor's railroad system, a situation which existed during the whole taxing period from September 1, 1933, to May 20, 1937, and for a long time prior thereto. * * * None of the subsidiaries has any rolling stock and their respective bank accounts are nominal and inactive. * * * The property of each is limited to their physical rights of way and improvements thereon. * * * They have no employees and never have had except their corporate officers. * * * Their boards of directors and officers are interlocking with the board of directors and officers of the debtor. * * * The corporate affairs of each of the subsidiaries were and are under the control and management of the debtor. * * *

\* \* \* \* \* \*

"Each of said railroad companies at the time of incorporation executed a mortgage to secure an issue of bonds, which bonds were acquired by the debtor at about the time of the execution of the mortgage and continue to be owned by the debtor. * * * The Ellenville and Kingston Railroad Company bonds are dated June 27, 1905, are in the principal amount of $650,000 and bear interest at the rate of 4% per annum payable on the first days of January and July in each year. * * * The bonds of the Port Jervis, Monticello and Summitville Railroad Company are dated June 27, 1905, they aggregate $450,000 in principal amount and bear interest at the rate of 4% per annum payable on the first days of January and July in each year. * * * The bond of the Ontario, Carbondale and Scranton Railway Company, dated November 4, 1889, is in the principal amount of $1,500,000 and bears interest at the rate of 5% per annum, payable on the first days of June and December in each year. * * * The debtor pledged these bonds as security on its own mortgages. * *. * The interest received from the subsidiaries was paid in the first instance by the subsidiary to the trustee of the mortgage, who in turn paid it to the debtor. * * *

"In the case of each subsidiary, its line of railroad is leased to the debtor. * * * The leases provide for the payment of a certain rent, which is mathematically the same amount and due on the same dates as the interest on the bonds of such subsidiaries. * * * The leases also provide that the debtor shall pay, and during the period September 1, 1933, to May 20, 1937, it did pay, all taxes on the subsidiaries. * * *"

It is contended by the trustees that the above subsidiaries are only departments of the debtor and that the rent which it had to pay under the leases to it offset the interest it received upon the bonds which it held, so that the interest was a purely artificial item which should not be included as part of gross income subject to the New York City Utility Tax. But, under the local laws we have heretofore mentioned, the debtor's receipts must be included in its gross income without any deductions. Accordingly the rent cannot be used to offset the payments of interest to the debtor by the subsidiaries. Under the decision of the Supreme Court in Moline Properties v. Commissioner, 319 U. S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499, it is quite evident that the existence of the subsidiaries as separate corporate entities cannot be ignored. Justice Reed, commenting on the earlier decisions in Southern Pacific Co. v. Lowe, 247 U.S. 330, 38 S.Ct. 540, 62 L.Ed. 1142, and Gulf Oil Corp. v. Lewellyn, 248 U.S. 71, 39 S.Ct. 35, 63 L.Ed. 133, on which the trustees rely, said, 319 U.S. at page 439, 63 S.Ct. at page 1134, 87 L.Ed. 1499, of the opinion in Moline Properties v. Commissioner that those decisions "have been recognized as * * * exceptions but held to lay down no rule for tax purposes." As Justice Reed also said in the same opinion, 319 U.S. at page 438, 63 S.Ct. at page 1134, 87 L.Ed. 1499:

"The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity."

Our own decisions in In re Bush Terminal Co., 2 Cir., 93 F.2d 661, and Gold & Stock Telegraph Co. v. Commissioner, 2 Cir., 83 F.2d 465, accord with our conclusion that the receipts of the debtor of interest from the three subsidiary railroads were properly held subject to the utility tax.

### 3.

### Interest Derived from Note of Scranton Coal Company.

The trustees object to the inclusion in the debtor's gross income of certain interest received by the debtor from the Scranton Coal Company on the note of the latter for $610,000. On September 1, 1933, the Scranton Coal Company, a subsidiary of the debtor, was indebted to the Chase National Bank upon a promissory note in the principal amount of $610,000 on which the debtor was an accommodation endorser. The Chase Bank sought and procured from the debtor its note in the principal amount of $600,000 and a cash payment of $10,000 on the note of the Scranton Coal Company. The bank thereafter held both notes upon its remaining claim of $600,000. The Scranton Coal Company listed the debtor on its books as its creditor for $610,000 and drew its checks to the debtor's order for interest on the $610,000 note. The debtor deposited these checks in its bank account and made out its own checks to the order of the Chase Bank in payment of interest on the $600,000 note given by it to the latter, retaining the interest on the $10,000 difference between the Scranton Coal Company note for $610,000 and its note for $600,000. The Special Master made the following finding as to these transactions which was confirmed by the District Court and is in accordance with the evidence:

"Although the Scranton Coal Company originally made its note, in the amount of $610,000, payable to the Chase National Bank for a loan, said note was endorsed by the Debtor for the accommodation of the Scranton Coal Company, and when the Debtor paid $10,000 to the Chase National Bank on account of said note and gave its own note in the amount of $600,000 for the balance, the Debtor became subrogated to the rights of the Chase National Bank with respect to the Scranton Coal Company note. Thereafter, the Scranton Coal Company owed the principal amount of the note and the interest thereon to the Debtor.

"The Scranton Coal Company's books listed the Debtor as its creditor; it drew a check for interest to the Debtor's order which the Debtor deposited in its bank account; the Debtor drew its own check in payment of the interest on its note for $600,000; the Debtor billed the Scranton Coal Company monthly for interest; and the Debtor retained the interest on the $10,000 difference between the Scranton Coal Company note and the Debtor's note.

"It is apparent from the foregoing that the interest received by the Debtor from the Scranton Coal Company was gross income of the Debtor and, * * * the fact that the Debtor did not retain said interest in its treasury has no relevancy with respect to the excise tax, measured by gross income, on the privilege of exercising a franchise, or of doing business, or of holding property."

We think the Chase Bank obtained the note of the debtor for $600,000 as a principal obligation in exchange for the original note of the Scranton Coal Company and retained the note of Scranton Coal Company for $610,000 as collateral therefor, and that interest on the $610,000 owing to the debtor by the Coal Company was properly included in the debtor's gross income subject to the utility tax.

### 4.

### Income Accrued Between March 1, 1934, and April 25, 1934.

The trustees contend that the City of New York, in measuring the excise tax, was not authorized to include any income which the debtor received during the peri-

od from March 1 to April 25, 1934, because no legislative enabling act was then in effect. But while authority to impose taxes under the first enabling act expired February 28, 1934 (L. 1933, Chapter 815), the next enabling act (L. 1934, Chapter 302) went into effect on April 25, 1934, and authorized the City to impose any tax which the Legislature has or would have power and authority to impose from the latter date to December 31, 1934. Pursuant to the enabling act of April 25, 1934, the City enacted Local Law No. 10 of 1934, p. 115, on June 7, 1934, imposing an excise tax at the rate of 1½% "for the privilege of exercising its franchise or franchises, or of holding property, or of doing business in the City of New York for the balance of the calendar year 1934" measured by its gross income for the period March 1, 1934, to December 31, 1934. The State Legislature undoubtedly had the power to use income accrued during a period prior to the date of the enactment of the Local Law as a measure for the franchise tax and the City lawfully embraced in its local ordinance income accruing during that part of the year following the expiration of the first enabling act on February 28, 1934. Educational Films Corp. v. Ward, 282 U.S. 379, 388, 51 S.Ct. 170, 75 L.Ed. 400, 71 A. L.R. 1226. The decision of the Special Master and the court below was accordingly correct and should be affirmed.

### The Appeal of the Trustees.

■ The debtor received interest amounting to $997.87 on bank balances maintained in the Orange County Trust Company of Middletown, New York, and in the Bank of Montreal in Canada. While the deposits on which interest was allowed by those banks may have resulted directly or indirectly from transactions in interstate commerce, the interest was no more than a current return of income on credits belonging to the debtor which it temporarily held. This interest was no more closely identified with interstate commerce than the interest derived from the railroad subsidiaries which we have already dealt with in this opinion. Such income was subject to a state franchise tax under the doctrine expounded in U. S. Glue Co. v. Oak Creek, 247 U.S. 321, 38 S.Ct. 499, 62 L.Ed. 1135,

Ann.Cas.1918E, 748; cf. Adams Mfg. Co. v. Storen, 304 U.S. 307, 314, 58 S.Ct. 913, 82 L.Ed. 1365, 117 A.L.R. 429. See also the general principles applicable in cases like the present set forth in Gwin v. Henneford, 305 U.S. at pages 438 and 439, 59 S.Ct. at page 325, 83 L.Ed. 272.

The Special Master found that: "The interest derived by the Debtor on bank balances carried outside of the City of New York never came into the City and it was disbursed by the Debtor from the banks in which it was earned. This interest was entered in the Debtor's books, kept in New York City, as income."

On the basis of the foregoing finding the Special Master reported that the City of New York could not measure its tax by the interest on the deposits with the Montreal and Middletown Banks because the balances therein did not have a situs in the City and the interest never came into the City and was not derived from the debtor's privilege of exercising its franchise, holding property or doing business in the City. The District Court upheld this finding.

■ A bank balance is an intangible asset and such an asset has its situs in the State in which the corporation has its commercial domicil and the asset may be taxed by that State. Wheeling Steel Corp. v. Fox, 298 U.S. 193, 211, 56 S.Ct. 773, 80 L.Ed. 1143; Commonwealth of Virginia v. Imperial Coal Sales Co., 293 U.S. 15, 19, 55 S.Ct. 12, 79 L.Ed. 171; Newark Fire Ins. Co. v. State Board, 307 U.S. 313, 59 S.Ct. 918, 83 L.Ed. 1312; cf. International Harvester Co. v. Evatt, 329 U.S. 416, 67 S.Ct. 444.

The business domicil of the debtor was plainly in New York City. This is apparent from the following finding:

"During this period the principal office of the Debtor was located in New York City where the president, treasurer, fiscal agent, secretary, general counsel, purchasing agent, traffic manager and general auditor had their offices. The Debtor's Board of Directors' meetings were held there. Its main books of account and bank depositaries were located in New York City (Ex. A). The major portion of the accounting of the Debtor was done in the City of Middletown, New York. The Debtor had no tracks in New York City."

526

■ This finding, taken together with the one first above quoted to the effect that "this interest was entered in the Debtor's books kept in New York City as income," is sufficient to establish that the debtor, a domestic corporation, had its principal office and business domicil within the City of New York, and is sufficient to establish, on the basis of the holdings in the cases above cited, that the situs of the debtor's out-of-city bank accounts is in the City of New York. In addition to this, Mr. Mathieson, the chief auditor of the debtor, testified that the bank accounts were disbursed in the ordinary course of business and that the account in Montreal was disbursed by check drawn on the Bank of Montreal. He also said the checkbooks were kept by the treasurer in the City of New York and were signed· by him and countersigned by one of the authorized officials and that the principal office of the debtor was in New York City. Upon such a record, we cannot doubt that the situs of the out-of-city bank accounts was in the City of New York and that the interest therein was properly to be included in the measure of the City's utility tax.

For the foregoing reasons the order is modified so as to allow the City's claim for taxes in such additional amount as is yielded by including the interest on the debtor's out-of-city bank balances in the measure of the tax and, as so modified, is affirmed.