[Civ. No. 6096. Third Appellate District.—June 19, 1939.]

STANDARD OIL COMPANY OF CALIFORNIA (a Corporation), Appellant, v. CHARLES G. JOHNSON, as State Treasurer, etc., Respondent.

Pillsbury, Madison & Sutro, Felix T. Smith, Sigvald Nielson and Douglas Erskine for Appellant.

Loeb & Loeb, Leon H. Levi and Keating Coffey, as *Amici Curiae*, on Behalf of Appellant.

U. S. Webb, Attorney-General, Earl Warren, Attorney-General, and H. H. Linney and James J. Arditto, Deputies Attorney-General, for Respondent.

PULLEN, P. J.—We are here considering four appeals from judgments entered after demurrers to plaintiff's amended complaints were sustained. Three appeals involve sales tax paid under protest at the time of payment. The fourth is an action to recover the amount of a deficiency assessment, which was also paid under protest, but all have been consolidated for the purposes of this appeal.

In the first three the Southern Pacific Company was the purchaser of fuel oil, and in the fourth complaint sales of fuel oil to the Southern Pacific Company, Western Pacific Railroad Company, and the Alaska Packers Association were involved, but the basic facts are similar, and we need summarize therefore, only the allegations of one of the causes of action.

The question here for determination as propounded by respondent is "when sales of tangible personal property and deliveries of the same to the buyer take place in California, are the sales exempted from a sales tax (Stats. 1933, p. 2610) by reason of the fact that they are intended to be transported to points outside the State of California, and, in fact, are subsequently so transported by the buyer"?

The facts as established by the allegations of the amended complaints as affect the Southern Pacific Company are, in brief, that the Standard Oil Company is a corporation organized under the laws of Delaware, and is qualified to carry on business in the State of California, and licensed under the Retail Sales Tax Act, *supra*. The Southern Pacific Company likewise is a corporation, qualified to do business in the State of California, and is organized under the laws of the State of Kentucky. The business of the Southern Pacific Company is the operation of steam railroads in California, Oregon, Nevada, Arizona, Utah, New Mexico and elsewhere. In the operation of its system, the Southern Pacific Company requires fuel oil in quantities, not available in the States of Oregon, Nevada, Arizona, Utah and New Mexico, and it must be obtained and brought into these states. The nearest and most practical source of supply for this purpose is the oil fields of California. (In the case of the Western Pacific, that

company operates railroads in California, Nevada, Utah and elsewhere, and the Alaska Packers Association operates a chain of steamships from California to points in Alaska.)

In order to obtain fuel oil to meet its requirements the Southern Pacific Company, in January, 1928, entered into a written contract with appellant, Standard Oil Company of California, by which it engaged to buy from appellant its requirements for fuel oil for the operation of its railroads in these states, which appellant agreed to supply.

Appellant's sources of supply of fuel oil, other than its sources of supply in California, are not sufficient to meet the Southern Pacific Company's requirements, and it was expressly contemplated by the parties, and was in fact an economic necessity, that appellant supply such requirements from the sources within the State of California.

It is further alleged that as fuel oil was required for use in the states named, the Southern Pacific Company placed its orders with appellant, which orders were filled by loading the oil into Southern Pacific Company cars at Tracy or El Segundo in California, and then transported to its fixed and certain destination in Oregon, Nevada or Arizona, as determined by the orders and waybills issued at the time of loading.

In opposition to the levy of the tax appellant contends that because the oil was intended to be shipped in interstate commerce at the time of requisition, and in fact was so shipped, the tax would be a burden on interstate commerce, and therefore the sales are specifically exempted by section 5a of the Retail Sales Tax Act. Upon the other hand, respondent contends that merely because the sales and deliveries were made in the State of California to the buyer, and were subsequently shipped in interstate commerce, does not exempt such sales from the application of the Retail Sales Tax Act.

Section 3 of the act provides, in part, as follows:

"For the privilege of selling tangible personal property at retail a tax is hereby imposed upon retailers at the rate of two and one-half per cent of the gross receipts of any such retailer from the sale of all tangible personal property sold at retail in this state on and after August 1, 1933, and to and including June 30, 1935; and at the rate of three per cent of the gross receipts of any such retailer from the sale of all tangible personal property sold at retail in this state on and after July 1,

1935. Such tax shall be paid at the time and in the manner hereinafter provided and shall be in addition to any and all other taxes.''

Section 5 of the act provides, in part, as follows:

''There are hereby specifically exempted from the provisions of this act and from the computation of the amount of tax levied, assessed or payable under this act the following:

'' '(a) The gross receipts from sales of tangible personal property which this state is prohibited from taxing under the Constitution or laws of the United States of America, or under the Constitution of this state.' ''

There is no dispute that the state may not interpose a tax on goods that move in interstate commerce, but just what is interstate commerce is not susceptible of a comprehensive definition, being a term of the widest import. In considering what is interstate commerce, we are not restricted merely to transportation of goods across state lines, for commercial intercourse involving transportation of goods from one state to another usually involves a sale as one of the steps in the transaction, and frequently the sale itself becomes an incident to the interstate movement and may be as much a part of the interstate commerce as the actual movement of the commodity. An illustration of such relationship is found in the shipment of wheat from the grain fields of the west where the farmer sells his grain to a buyer who finds his market at the mills throughout the world, or the coal miner in the Appalachian coal fields who sells his coal at the mine which is then transported to the point of consumption in other states. (*Dahnke-Walker Milling Co.* v. *Bondurant,* 257 U. S. 282 [42 Sup. Ct. 106, 66 L. Ed. 239]; *Lemke* v. *Farmers' Grain Co.,* 258 U. S. 50 [42 Sup. Ct. 244, 66 L. Ed. 458]; *United States* v. *Reading Co.,* 226 U. S. 324 [33 Sup. Ct. 90, 57 L. Ed. 243]; *United Fuel Gas Co.* v. *Hallanan,* 257 U. S. 277 [42 Sup. Ct. 105, 66 L. Ed. 234].)

Respondent recognizes the close relationship between sale and transportation but insists the goods must be delivered by the seller to an independent common carrier for transportation to the buyer at a point beyond the boundary of the state of origin. The Supreme Court of the United States, however, before whom this question has been most frequently presented, seems to hold otherwise.

In *Dahnke-Walker Milling Co.* v. *Bondurant, supra,* the court, in considering the regulation of interstate commerce, said:

" . . . Such commerce is not confined to transportation from one state to another, but comprehends all commercial intercourse between different states and all the component parts of that intercourse. . . . On the same principle, where goods are purchased in one state for transportation to another the commerce includes the purchase quite as much as it does the transportation."

In *Lemke* v. *Farmers' Grain Co., supra,* the court said:

"The record discloses that North Dakota is a great grain-growing state, producing annually large crops, particularly wheat, for transportation beyond its borders. Complainant, and other buyers of like character, are owners of elevators and purchasers of grain bought in North Dakota, to be shipped to and sold at terminal markets being at Minneapolis and Duluth. There is practically no market in North Dakota for the grain purchased by complainant. The Minneapolis prices are received at the elevator of the complainant from Minneapolis four times daily, and are posted for the information of those interested. To these figures the buyer adds the freight and his 'spread', or margin, of profit. The purchases are generally made with the intention of shipping the grain to Minneapolis. The grain is placed in the elevator for shipment, and loaded at once upon cars for shipment to Minneapolis and elsewhere outside the state of North Dakota. The producers know the basis upon which the grain is bought, but whoever pays the highest price gets the grain,—Minneapolis, Duluth, or elsewhere. This method of purchasing, shipment, and sale is the general and usual course of business in the grain trade at the elevator of complainant and others similarly situated. The market for grain bought at Embden is outside the state of North Dakota, and it is an unusual thing to get an offer from a point within the state. After the grain is loaded upon the cars it is generally consigned to a commission merchant at Minneapolis. At the terminal market the grain is inspected and graded by inspectors licensed under federal law.

"That such course of dealing constitutes interstate commerce, there can be no question. This court has so held in many cases, and we have had occasion to discuss and decide the nature of such commerce in a case closely analogous in

its facts, and altogether so in principle *Dahnke-Walker Milling Co.* v. *Bondurant,* decided December 12, 1921 (257 U. S. 282, *ante,* 239, 42 Sup. Ct. 106)."

So, likewise, in *United States* v. *Reading, supra,* it is said:

"Much of the coal so brought was sold in Pennsylvania and all of the contracts were made in that state and the coal was also there delivered to the buying defendants. That the defendants were free to sell again within Pennsylvania, or transport and sell beyond the state, is true. That some of the coal was intended for local consumption may also be true. But the general market contemplated was the market at tide-water, and the sales were made upon the basis of the average price at tide-water. The mere fact that the sales and deliveries took place in Pennsylvania is not controlling when, as here, the expectation was that the coal would, for the most part, fall into and become a part of the well-known current of commerce between the mines and the general consuming markets of other states. 'Commerce among the states is not a technical legal conception, but a practical one, drawn from the course of business.' (*Swift & Co.* v. *United States,* 196 U. S. 375, 398 [25 Sup. Ct. 276, 49 L. Ed. 518] ; *Loewe* v. *Lawlor,* 208 U. S. 274 [28 Sup. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815].)"

As held also in *Santa Cruz Fruit Packing Co.* v. *National Labor Relations Board,* 303 U. S. 453 [58 Sup. Ct. 656, 82 L. Ed. 954], one selling goods to a buyer in another state is nevertheless engaged in interstate commerce regardless of the fact the goods are delivered for transportation f. o. b. at points within the state of origin.

It would appear from the foregoing, therefore, that the point of delivery to the buyer need not be beyond the state of origin to establish the state of interstate commerce.

Next, does the fact that in the instant case the oil was delivered to the buyer and not to an independent common carrier affect the situation? We think not, for from an examination of *Lemke* v. *Farmers' Grain Co., supra,* and *Shafer* v. *Farmers' Grain Co.,* 268 U. S. 189 [45 Sup. Ct. 481, 69 L. Ed. 909], we find the buyers took delivery at their own elevators and shipped the grain out of the state when and as they saw fit. In *United States* v. *Reading, supra,* and *United Fuel Co.* v. *Hallanan, supra,* the buyers took delivery and transported

out of the state,—in one case in their own cars, and the other through their own pipe lines.

So, also, it would seem to be immaterial that the oil here in question was for the ultimate use of the buyer. It is the economic situation that governs and not the accidental fact that the commodity was to be used by a particular entity or was transported by a particular carrier. The purchase was made because in California and in California only, the commodity is found in commercial quantities near the point of use and transported thence because of a consumer's demand. No oil is produced in Nevada, Utah or Arizona in commercial quantities, and the railroad, operating extensively in those states, must obtain fuel oil requirements where nature has placed the oil, and therefore is compelled to go to California to supply its needs, and to supply that need, transportation is also an element. The demand has created a continuous definite movement out of the state, kept up by economic necessity.

Respondent, in support of his contention that the tax upon the receipts from the sales in question was not prohibited by the regulations of interstate commerce, submits that the case of *Superior Oil Co.* v. *Mississippi*, 280 U. S. 390 [50 Sup. Ct. 169, 74 L. Ed. 504], supports his contention. In that case a distributor of petroleum in Louisiana sold gasoline to a buyer in Louisiana. The gasoline was delivered to the buyer in Louisiana and transported by him to a fishing fleet in Mississippi under the original bills of lading from the seller consigning gasoline to the buyer in Mississippi. Thereafter the buyer sold the gasoline in Mississippi to certain fishermen who used the fuel in operating their fishing boats, and at the end of the season settled with the buyer in Louisiana. The court there held that this transaction was intrastate and therefore subject to the Louisiana sales tax on the sale of gasoline. There, Mr. Justice Holmes, in considering the transaction, said:

"The document (bill of lading) seems to have had no other use than as the Supreme Court of Mississippi said, to try to convert a domestic transaction into one of interstate commerce. There was no consignee at the point of destination. The goods were delivered to the so-called consignee before they started and were in its hands throughout. There was no point of destination for the delivery of the oil but merely a neighborhood in which the packer that had bought it and already had

it, expected to sell it again. . . . We may admit that this case is near the line. . . . If, by mutual agreement, the oil had been put into the hands of a third person, a common carrier, for transportation to Louisana, the mere possibility that the vendor might be able to induce the carrier to forego his rights, might not have been enough to keep the transaction out of interstate commerce. . . . A distinction has been taken between sales made with a view to a certain result and those made simply with indifferent knowledge that the buyer contemplates that result.''

This, as stated by the court, is a border line case, but it appears from the facts that the presence of the buyer in Mississippi was merely fortuitous. It had no place of business in Mississippi, no actual presence therein. Neither was there any indication of a title of gasoline moving in interstate commerce from Louisiana to Mississippi. Obviously it was, as the court pointed out, an attempt to convert an intrastate sale to a transaction in interstate commerce.

Somewhat analogous in principle is the case of *Wiloil Corp.* v. *Pennsylvania*, 294 U. S. 169 [55 Sup. Ct. 358, 79 L. Ed. 838]. In that case the buyer in Pennsylvania purchased gasoline from a seller in Pennsylvania, who acquired the same in Delaware. The gasoline was to be delivered f. o. b. Wilmington, Delaware, and shipped from Wilmington to the buyer's place of business in Pennsylvania. In that case the Supreme Court concluded that since the gasoline could as well have been supplied from sources in Pennsylvania as from sources in Delaware, and since it was a matter of indifference to the buyer whence the gasoline came from, and interstate transportation was not a necessary and essential element of the sale,—the f. o. b. price at Wilmington, Delaware, was nothing more than a price-fixing arrangement. Said the court:

'' . . . Appellant was not required by the contracts to obtain the fuel at Wilmington, but was free to effect performance by shipping from any place within or without Pennsylvania. . . . These contracts did not require or necessarily involve transportation across a state line.''

Another case considered in this appeal and relied upon by appellant is *Spaulding & Bros.* v. *Edwards*, 262 U. S. 66 [43 Sup. Ct. 485, 67 L. Ed. 865], wherein a merchant in South America, through his agent in New York, purchased a supply

of baseball bats for shipment to South America. The bats were delivered by Spaulding & Bros. to the agent in New York, and the title was in him before the goods left the state. A taxing agency of the government contended that the sale had been completed in the United States, and that the purchaser, through its agent, had complete title to and control over the property in New York, and might have diverted the use of the property to any use it pleased. The Supreme Court held, however, that the transaction constituted a sale of articles exported from a state and could not be taxed by the United States under the provisions of the Constitution.

The court there said:

"Neither does it matter that the title was in Scholtz & Co. (the commission agent acting for the buyer) and that theoretically they might change their mind and retain the bats and balls for their own use. There was not the slightest probability of any such change and it did not occur. The purchase by Scholtz & Co. was solely for the purpose of Delgardo & Cia, and for their account and risk. Theoretical possibilities may be left out of account."

A fourth case is that of *Eastern Air Transport, Inc.*, v. *South Carolina Tax Com.*, 285 U. S. 147 [52 Sup. Ct. 340, 76 L. Ed. 673], where the court upheld the right of a state to impose a sales tax on sales of gasoline within the state, delivery made therein, even though the buyer subsequently used the gasoline solely as a source of motive power in interstate transportation. There the gasoline was pumped directly into the tanks of planes landing in South Carolina, but operating interstate, and immediately thereafter was used to propel the planes, both within and without the state of Carolina. The court logically held the sale to be intrastate, saying:

" . . . But the mere purchase of supplies or equipment for use in conducting a business which constitutes interstate commerce is not so identified with that commerce as to make the sale immune from a non-discriminatory tax imposed by the state upon intrastate dealers."

In the case before us it is clear from the physical facts alleged in the complaint that plaintiff was not attempting to create a fictitious transaction to avoid the imposition of the sales tax as was the case in *Superior Oil Co.* v. *Mississippi, supra,* for it is obvious that regardless of who may have been

assigned the duty of transporting the oil out of California, its point of consumption lay beyond the boundaries of our state.

After examining the many cases which have been submitted to us in the able briefs before us, we are unable to distinguish the case at bar from the principles laid down in the case of *Spaulding & Bros.* v. *Edwards, supra,* and we are, largely upon the principles there announced, as well as from the general rules governing interstate commerce, compelled to conclude that the transactions before us were sales in interstate commerce and therefore immune from tax by this state under the provisions of clause 3, section 8, of article I of the Constitution of the United States, and expressly exempted from the retail sales tax under the provisions of section 5 (a) of the Retail Sales Tax Act of 1933.

The judgments are reversed.

Tuttle, J., concurred.

Thompson, J., deeming himself disqualified, did not participate in the decision.