# WOOD PRESERVING CORPORATION v. DEPARTMENT OF TREASURY OF STATE OF INDIANA.
## No. 7126.

Circuit Court of Appeals, Seventh Circuit.
July 20, 1940.

Rehearing Denied Oct. 3, 1940.

Frederick E. Matson and Harry T. Ice, both of Indianapolis, Ind. (Carleton M. Crick, of Pittsburgh, Pa., and Matson, Ross, McCord & Ice, of Indianapolis, Ind., of counsel), for appellant.

Omer Stokes Jackson, Atty. Gen., and Joseph W. Hutchinson and Joseph P. Mc-Namara, Deputy Attys. Gen., for appellees.

Before SPARKS and MAJOR, Circuit Judges, and LINDLEY, District Judge.

MAJOR, Circuit Judge.

This is an appeal from a judgment against the plaintiff in an action to recover taxes collected by defendants under the Indiana Gross Income Tax Act of 1933 (Chap. 50, Indiana Acts 1933, Burns' Statutes Annotated 1933, § 64-2601 et seq.). The court adopted the "stipulation of findings" filed by the parties as its special findings of fact, and stated its conclusions thereon. The errors relied on arise out of the court's conclusions of law.

The facts, as found by the court, are lengthy, and while not in dispute, it seems essential to state a resumé of the same in order properly to consider the questions of law presented.

All the gross receipts in question were received by plaintiff during 1934, 1935 and 1936 (the taxable years), from the sale of cross-ties furnished to the Baltimore and Ohio Railroad Company pursuant to certain contracts and course of dealings had between the parties. One contract was between Central Creosoting Company of Delaware, operating a treatment plant[1] at Finney, Ohio, and the railroad, a Maryland Corporation, with main offices at Baltimore, Maryland, executed December 21, 1922, which, prior to 1933, was assigned to National Lumber and Creosoting Company. Subsequently, but prior to 1933, plaintiff acquired control of this company and operated it as a subsidiary. By this contract, the railroad was required to deliver annually to the plant at Finney, Ohio, a minimum of 600,-000 ties for treatment. The railroad had another contract with the Joyce-Watkins Company of Illinois, which operated a

---

[1] A treatment plant is one in which the raw ties are creosoted or otherwise treated prior to use by the railroad. Plaintiff's compensation for such service was not included in, and forms no part of, the gross income involved in this litigation.

treatment plant, owned by the railroad, at Green Springs, West Virginia. This contract was assigned by Joyce-Watkins to plaintiff March 1, 1933, and provided terms by which plaintiff was to purchase and sell ties to the railroad and operate the plant. Before plaintiff commenced operations, a supplemental agreement was made between the railroad and the plaintiff, accepted and followed by the plaintiffs, during the taxable years, that all ties originating at points on the railroad west of the Ohio River (including Indiana), should be shipped by plaintiff to Finney, Ohio.

Plaintiff is a Pennsylvania corporation with its main office at Pittsburgh. Its office from which its tie business was operated was at Marietta, Ohio. It maintained no office in Indiana, but was qualified to do business in that state where it had a statutory agent for service of process. The railroad company, when it desired ties—in conformity with the Joyce-Watkins contract—through its purchasing agent at Baltimore, Maryland, telephoned plaintiff's Marietta office, stating the number of ties wanted and the price it would pay delivered f. o. b. cars at loading point. Plaintiff's Marietta office would then send a price list circular to producers of ties in its territory, including Indiana, which contained specifications, prices to be paid on the ground at loading point, and the information that plaintiff would pay additional for loading ties on the cars. In response to this price circular, the producers would notify plaintiff at its Marietta office by mail, telephone or telegraph of the quantity, type and quality of ties they could furnish, as well as the nearest loading point. Ties were delivered to such point by the producers, where an agent of the plaintiff, assigned from its Marietta office, and an inspector for the railroad, would go. The ties were examined by the railroad inspector and accepted or rejected. If accepted, they were loaded upon a car of the railroad at plaintiff's expense.

At the end of each day, the railroad inspector would make out a report of ties accepted, and give a copy to plaintiff's agent. On the basis of this report, plaintiff's agent each day paid the producer by sight draft on banks outside the state, for ties accepted by the railroad. The producer received no pay for ties rejected. When loading was completed, plaintiff's

agent made out a uniform bill of lading showing plaintiff as consignor, consigning the ties to the railroad in care of its chief engineer of maintenance at Finney, Ohio. Plaintiff paid no freight for transporting the ties. Plaintiff's agent then sent to its Marietta office a copy of the railroad inspector's report of ties accepted and loaded, a copy of the draft used in paying the producer, and a shipping report showing the number and type of ties delivered to the railroad, the number of the car and the billing to Finney, Ohio. The agent also sent to the Finney, Ohio treatment plant, copies of the same papers, and to the railroad office at Baltimore, Maryland, a copy of the billing of the car to its chief engineer of maintenance at Finney, Ohio. At the end of each week, plaintiff's Marietta office made out and sent to the railroad at its Baltimore office, an invoice of ties sold and delivered to it during the previous week. At the end of each month, plaintiff's Marietta office sent its Pittsburgh office a statement showing all invoices rendered the railroad during the month for ties loaded in Indiana and shipped to Finney, Ohio. All ties purchased from plaintiff by the railroad during the taxable years were delivered to Finney, Ohio for treatment. All office and bookkeeping functions connected with these transactions were performed at plaintiff's office in Marietta, Ohio, and Pittsburgh, Pennsylvania.

No payments for ties were received by plaintiff in Indiana. They were all made by the railroad from its Baltimore office and sent to plaintiff at its office in Pittsburgh, Pennsylvania, and deposited by plaintiff in its Pittsburgh bank. It is the income thus received about which the controversy in the instant case revolves.

The contested issues are not in dispute and, as stated by plaintiff, are:

1. Whether the gross income taxes herein sought to be recovered are invalid as in violation of the due process clause of the 14th Amendment to the Federal Constitution, because laid upon a taxable event—the receipt of gross income—which occurred outside the territorial limits of Indiana and beyond the jurisdiction of the taxing authorities.

2. Whether the gross income taxes herein sought to be recovered are invalid as in violation of the due process clause of the 14th Amendment to the Federal

Constitution, because laid without allocation or apportionment upon business activities both without and within the territorial limits of Indiana and, as to activities outside the state, beyond the jurisdiction of the taxing authorities.

3. Whether the gross income taxes herein sought to be recovered are invalid as in violation of the commerce clause, Article I, Section 8, of the Federal Constitution, because laid upon receipts derived from interstate commerce, constitute a direct burden upon such commerce and are of a type which subjects the commerce to the risk of multiple taxation of like kind in other states.

The solution of the first contested issue depends upon an answer to the question— What was the taxable event? It is contended by the plaintiff that the event was the receipt of gross income which occurred in Pennsylvania. If this position is sound, it is evident—in fact, not disputed—that the State of Indiana was without power to levy and collect the tax. It is defendants' contention, as stated in their brief, that "the thing which the Statute authorizes as the taxable event, the thing which was taxed, is the transaction which occurs within Indiana involved in one of two things, either doing business within the state or deriving income from a source within the state." Under this theory, the gross income received in Pennsylvania is merely the measure for the tax.

It is at once apparent that the respective contentions require a construction of the Statute relied upon as authority for the tax. The Act is entitled "An Act to provide for the raising of public revenue by imposing a tax upon the receipt of gross income * * *." Section 1 provides that this Act may be cited as the "Gross Income Tax Act of 1933." Section 2 of the Act, the one in controversy, provides: "There is hereby imposed a tax, measured by the amount or volume of gross income, and in the amount to be determined by the application of rates on such gross income as hereinafter provided. Such tax shall be levied upon the entire gross income of all residents of the State of Indiana, and upon the gross income derived *from sources* within the State of Indiana, of all persons and/or companies, including banks, who are not residents of the State of Indiana, but are engaged in business in this state, or who derive gross income from sources within this state, and shall be in addition to all other taxes now or hereafter imposed with respect to particular occupations and/or activities. * * *"

Section 3 provides the applicable rates "upon the entire gross income of every person * * *."

This Act has been construed by the Supreme Court in Adams Mfg. Co. v. Storen, 304 U.S. 307, 58 S.Ct. 913, 82 L.Ed. 1365, 117 A.L.R. 429. There, the taxpayer, an Indiana corporation, was a manufacturer of road machinery and equipment, and maintained its home office, principal place of business, and factory in the state. A good part of its products was sold to customers in states other than Indiana. Payments for its products were remitted to the home office. The case reached the Supreme Court by appeal from the Supreme Court of Indiana, 212 Ind. 343, 7 N.E.2d 941, 944, which had construed the tax to be "upon the privilege of domicile, and transacting business, and receiving gross income, within the state, and measured by the amount of gross income." This construction was reversed by the Supreme Court of the United States. The court points out (page 310 of 304 U.S., page 915 of 58 S.Ct., 82 L.Ed. 1365, 117 A.L.R. 429) that it is not a tax on the transaction of business, nor a charter or franchise tax, nor a tax upon the privilege of producing or manufacturing within the state, but said: (page 311 of 304 U. S., page 916 of 58 S.Ct., 82 L.Ed. 1365, 117 A.L.R. 429) "We conclude that the tax is what it purports to be—a tax upon gross receipts from commerce." The court, on the same page, 304 U.S. page 311, 58 S.Ct. page 915, 82 L.Ed. 1365, 117 A.L.R. 429, also said: "The regulations issued by the Department of the Treasury, pursuant to authority granted by the Act, treat the exaction as a gross receipts tax; and the Attorney General says in his brief that it is a privilege tax upon the receipt of gross income. We think this a correct description."

The distinction sought to be made by defendants between the Adams case and the instant one is, that in the former the taxpayer was a resident of the state, while in the latter the taxpayer is a non-resident, and that, therefore, the language of the Act "such tax shall be levied * * *

926

upon the gross income derived from sources within the State of Indiana * * * engaged in business in this state, or who derive gross income from sources within this state," upon which the instant tax is predicated, was not before the Supreme Court in the Adams case and, therefore, that case is not controlling.

■ The distinction sought to be made, if sustained, leads to the result that two separate and distinct "taxing events" are contemplated by the Act, (1) where the gross income is received by a resident, and (2) where gross income is received by a non-resident. As to the former, the court held the taxable event to be "the receipt of gross income." It is here argued by the defendants that the taxable event is not the receipt of gross income, but the privilege of doing business or deriving income from a source within the state. Defendants insist that the plain language of the Act requires such a construction. We do not agree. As the Supreme Court pointed out in the Adams case (page 309 of 304 U.S., page 915 of 58 S.Ct., 82 L.Ed. 1365, 117 A.L.R. 429), "the title of the Act declares that it is a revenue measure imposing a tax upon 'the receipt of gross income.' The statute defines gross income as meaning the gross receipts derived from trades, businesses, or commerce." It seems certain that the title of the Act applies to non-residents as well as residents. All through the Act the tax is referred to as one upon "gross income." The regulations of the Treasury Department (footnote, Adams case, page 311 of 304 U.S., pages 915, 916, of 58 S.Ct., 82 L.Ed. 1365, 117 A.L.R. 429) clearly treat the taxable event as "gross income received." It appears to us that the non-resident provision of the Act, upon which defendants rely, was intended to apply to persons, not legal residents of the State, but living temporarily, or engaged in business in the state and receiving income there. That construction is consistent with the title and terms of the Act, as well as the interpretation placed thereon by the Supreme Court in the Adams case. On the other hand, the construction sought by defendants is inconsistent therewith. Defendants rely strongly upon Equitable Life Society v. Pennsylvania, 238 U.S. 143, 35 S.Ct. 829, 830, 59 L.Ed. 1239, as sustaining their contention. There the tax related to premiums received by in-surance companies. The company contended it was a tax on property, but the Act was construed both by the State Court and the Supreme Court as levying "a tax for the privilege of doing business within the commonwealth." The tax was sustained in that case on a theory similar to that adopted by the court in American Mfg. Co. v. St. Louis, 250 U.S. 459, 39 S.Ct. 522, 63 L.Ed. 1084, where the tax was laid on the privilege of pursuing the occupation of a manufacturer in the City of St. Louis. This latter case was referred to, and distinguished by the Court in, the Adams case (page 312 of 304 U.S., 58 S.Ct. page 916, 82 L.Ed. 1365, 117 A.L.R. 429).

■ Concluding as we do, that the thing taxed in the instant case was "the receipt of gross income," it follows that such income received by plaintiff in Pennsylvania was beyond the jurisdiction of the State of Indiana to tax, and that the collection of such tax was unconstitutional and void. Safe Deposit & T. Co. v. Virginia, 280 U.S. 83, 92, 50 S.Ct. 59, 74 L. Ed. 180, 67 A.L.R. 386; Curry v. McCanless, 307 U.S. 357, 366, 59 S.Ct. 900, 83 L.Ed. 1339, 123 A.L.R. 162.

■ Under the second contested issue, it is contended by the plaintiff that the tax is invalid because laid without allocation or apportionment upon business activities both within and without the State of Indiana. Defendants meet this contention by asserting that plaintiff's income was derived from business engaged in, and from a source within Indiana, and that there was nothing to apportion. The conflicting views under this issue arise from a disagreement as to the factual situation rather than legal conclusions. We think it has been held generally that before a valid tax can be laid upon a business conducted in, or source of income received from more than one state, there must be an allocation or apportionment of that portion of the business done in, or source of income received from, the taxing state. Adams Mfg. Co. v. Storen, supra, 304 U.S. page 314, 58 S.Ct. 913, 82 L.Ed. 1365, 117 A.L.R. 429; Gwin, White & Prince Inc. v. Henneford, 305 U.S. 434, 439, 59 S.Ct. 325, 83 L.Ed. 272. The question which naturally arises and is determinative of this issue is, whether the receipt by plaintiff of gross income was derived from business engaged in and from a source within the State of

Indiana. Defendants contend that the only transaction involved was plaintiff's sale and delivery in Indiana of raw, untreated cross-ties to the railroad. If this be true, it follows that the cases which stand for the apportionment theory, are without application.

We are of the opinion, however, that defendants' contention in this respect is not tenable. We have stated heretofore the facts concerning the transactions constituting the source of income and shall not repeat. It is sufficient to point out that a sizable portion of the business affording the source of income, was transacted outside the State of Indiana, both before and subsequent to the actual delivery of the ties to the railroad. It is true, the immediate receipt of the income was from the sale of the ties, which took place in Indiana, but what took place there was merely a culmination of contracts and transactions entered into outside of that state. Had it not been for such contracts and transactions, it appears there would have been no source of income in Indiana or elsewhere. That such outside transactions contributed materially to the source of income within the state, there is little, if any, room for doubt. To think otherwise is to close our eyes to the realities of the situation and view the business and transactions of the parties as consisting only of the delivery of the ties. It is our conclusion, therefore, that the source of income was not confined to transactions occurring in Indiana, but was contributed to largely by transactions occurring in other states. Therefore, the situation comes within those authorities which hold that an apportionment is required.

■ Nor do we think, as argued, that the burden is upon the taxpayer to make an apportionment. It would seem more reasonable to think that it is incumbent upon the state, which seeks to impose the tax, to provide a method of determining that portion of the income derived from transactions occurring within the state. In Hans Rees' Sons v. North Carolina, 283 U.S. 123, 133, 51 S.Ct. 385, 75 L.Ed. 879, the court discusses a similar question and appears to recognize that the burden is upon the state to adopt a method which will be sustained in absence of proof that it is unreasonable or arbitrary. (See cases cited and discussed in Gwin, White & Prince, Inc., v. Henneford, 305 U.S.

434, at pages 438-441, 59 S.Ct. 325, 83 L. Ed. 272.)

■ Assuming that defendants' theory as to the "taxable event" is sound (we have held to the contrary), yet we are of the opinion that the tax as laid is invalid because no method is provided by the Act or otherwise for allocating the tax to the income derived from that part of the business transacted in Indiana.

The third contested issue is closely related to the second, and much of what has been said concerning the latter is applicable. The defendants' position is again predicated on the theory that the gross income used as the tax measure, was the result of intra-state transactions independent of interstate commerce, or if related to interstate commerce, in a manner such as to place no substantial burden thereon.

Here also, we think defendants' argument is based upon an erroneous appraisement of the activities which entered into the transactions providing the source of income. As stated heretofore, we are of the opinion that the transactions which occurred in Indiana constituted merely a portion of the business in which the parties were engaged. Defendants stress the argument that the ties were delivered to the purchaser (railroad) in Indiana to be used by the railroad company as it saw fit, and without cost of transportation to the plaintiff. In this connection, it is argued that title passed to the railroad at the time of delivery and that the plaintiff no longer had any control or dominion over the ties.

This argument, however, ignores what we think the facts disclose—that is, that the plaintiff and the railroad were obligated by contracts, the former to purchase the ties and deliver them to the railroad for the purpose of transportation into another state to a treatment plant in which plaintiff had a controlling interest, and the latter to make such transportation. Under these circumstances, we do not think it is material, and certainly not controlling, as to whether the railroad acquired title at the point where the ties were received in Indiana, or at the point in Ohio where they were consigned by the plaintiff and received by the maintenance department of the railroad. Spalding & Bros. v. Edwards, 262 U.S. 66, 70, 43 S.

Ct. 485, 67 L.Ed. 865; Santa Cruz Co. v. Labor Board, 303 U.S. 453, 463, 58 S.Ct. 656, 82 L.Ed. 954. Even if the carrier acquired title at the receiving point, with the technical right to ship where it pleased or to use the ties otherwise than as intended, it would not change the situation. As was said in discussing a similar contention in Spalding & Bros., supra v. Edwards, page 70 of 262 U.S., page 486 of 43 S.Ct., 67 L.Ed. 865: "* * * There was not the slightest probability of any such change and it did not occur. * * * Theoretical possibilities may be left out of account."

In the instant case the parties, without deviation, followed the same course of conduct during the taxable years. If we are correct in our premise that the parties were doing business under a contract obligation, the statement of the court in Sonneborn Bros. v. Cureton, 262 U.S. 506, 515, 43 S.Ct. 643, 646, 67 L.Ed. 1095, seems pertinent. The court said: "* * * They were in effect contracts for the sale and delivery of the oil across state lines. The soliciting of orders for such sales is equally exempt. Such transactions are interstate commerce in its essence and any state tax upon it is a regulation of it and a burden upon it. [Citing cases.]"

The loading of the ties upon the railroad car for the purpose of transportation to another state was in itself an act of interstate commerce. In Puget Sound Co. v. Tax Commission, 302 U.S. 90, 94, 58 S.Ct. 72, 74, 82 L.Ed. 68, the court said: "The business of loading and unloading being interstate or foreign commerce, the state of Washington is not at liberty to tax the privilege of doing it by exacting in return therefor a percentage of the gross receipts. Decisions to that effect are many and controlling: * * *"

Defendants place great reliance upon the case of Superior Oil Co. v. Mississippi, 280 U.S. 390, 50 S.Ct. 169, 74 L.Ed. 504. A study of this case, however, is convincing that it has little, if any, relevancy to the instant situation. There the State of Mississippi sought to collect a tax upon gasoline sent by the oil company to packers of sea food located in the same state. The latter, after receipt of the gasoline, were free to dispose of it as they saw fit. After its receipt, the gasoline was loaded on their own boats and carried to fishermen across the state line in Louisiana.

It was contended that this course of dealing was known to the oil company, and, in addition, when delivery was made to the packers, it took back from the latter a so-called bill of lading reciting that the property continued to be the property of the oil company until its delivery in Louisiana. The court labeled this document as an effort (page 394 of 280 U.S., page 170 of 50 S.Ct., 74 L.Ed. 504) "* * * to try to convert a domestic transaction into one of interstate commerce. There was no consignee at the point of destination. The goods were delivered to the so-called consignee before they started, and were in its hands throughout. * * *" Again the court, (page 395 of 280 U.S., page 170 of 50 S.Ct., 74 L.Ed. 504) said: "* * * But here the gasoline was in the hands of the purchaser to do with as it liked, and there was nothing that in any way committed it to sending the oil to Louisiana except its own wishes. * * * The only purpose of the vendor here was to escape taxation. * * *" Such a situation has little similarity to that of the instant case where the parties were engaged in bona fide transactions in conformity with contractual obligations, as well as with long usage and custom. Here there is not even a suspicion of an effort to avoid taxation. In fact, the same course of business had been followed by the parties continuously since a period prior to the enactment of the Act in question.

A case very much discussed in the briefs by parties for both sides is that of Dahnke-Walker Co. v. Bondurant, 257 U.S. 282, 42 S.Ct. 106, 66 L.Ed. 239. There, by contracts made in Kentucky, a farmer agreed to sell wheat to Dahnke-Walker and deliver it f.o.b. cars at the farmer's home in Kentucky. The wheat was paid for there, and title passed to the purchaser when the wheat was loaded on the cars. Afterwards, the seller had no control or dominion over the wheat. Thus, the entire transaction of purchase and sale, including delivery, payment, and passage of title—all occurred in Kentucky. It was shown, however, that by the course of business in prior years, the wheat was intended to go to Tennessee for treatment at the purchaser's mill. That had been the practice and custom in the past, and was known to both parties. The court held the transaction to be interstate com-

merce on the principle that (page 290 of 257 U.S., page 108 of 42 S.Ct., 66 L.Ed. 239) "* * * where goods are purchased in one state for transportation to another, the commerce includes the purchase quite as much as it does the transportation. * * *" The fact is stressed (page 292 of 257 U.S., page 109 of 42 S.Ct., 66 L.Ed. 239) "* * * that the delivery was to be on board the cars and that the plaintiff, in continuance of its prior practice, was purchasing the grain for shipment to its mill in Tennessee. * * *" The facts of the present case are stronger in favor of interstate commerce. Here, all payments were made and received out of the state and the purchaser, even if title passed at the loading point, could not have prevented the ties from going to Finney, Ohio, without violating its contract to deliver them there for treatment. Here also, both parties had an interest in transporting the ties from Indiana to Finney, Ohio.

Defendants seek to distinguish the Dahnke-Walker case in two ways, (1) that in the instant case the purchaser (railroad) was the common carrier, while in the Dahnke-Walker case the carrier was a third party, and (2) in that case the court was not concerned with the power to tax, but with the power to regulate. As to (1), we think it has been held generally that the fact that the carrier is itself the owner of the property being transported, is a circumstance only to be considered in determining the nature of the commerce. In no case, so far as we are aware, has it been held conclusive. The Pipe Line Cases (United States v. Ohio Oil Co.), 234 U.S. 548, 560, 34 S. Ct. 956, 58 L.Ed. 1459; United Fuel Gas Co. v. Hallanan, 257 U.S. 277, 281, 42 S. Ct. 105, 66 L.Ed. 234; Standard Oil Co. v. Johnson, 33 Cal.App.2d 430, 92 P.2d 470, 472-473. As to (2), it is true the court in Sonneborn Bros. v. Cureton, 262 U.S. 506, 514, 43 S.Ct. 643, 67 L.Ed. 1095, called attention to the fact that the Dahnke-Walker case was not concerned with the power to tax, but we know of no case where such distinction has been given application. The court made no such distinction in Minnesota v. Blasius, 290 U. S. 1, 54 S.Ct. 34, 78 L.Ed. 131, which was a revenue case. After citing the Dahnke-Walker and other cases, the court, on page 9 of 290 U.S., page 36 of 54 S.Ct.,

78 L.Ed. 131, said: "* * * Thus, the states cannot tax interstate commerce, either by laying the tax upon the business which constitutes such commerce or the privilege of engaging in it, or upon the receipts, as such, derived from it. Similarly, the states may not tax property in transit in interstate commerce. * * *" True, the court sustained the tax on the proposition that the transportation claimed to be interstate had ceased and was no longer protected by the commerce clause. No distinction was made, however, between the power to tax and the power to regulate such commerce.

█ We reach the conclusion that the transactions in question were had in interstate commerce. It does not always follow, however, that interstate commerce is immune from taxation. Western Live Stock v. Bureau of Revenue, 303 U.S. 250, 254, 255, 58 S.Ct. 546, 82 L.Ed. 823, 115 A.L.R. 944; Gwin, White & Prince, Inc. v. Henneford, 305 U.S. 434, 438, 59 S.Ct. 325, 83 L.Ed. 272. Both of these cases, however, stand for the rule often announced, that state taxation, whatever its form, is precluded if it discriminates against interstate commerce.

If we are correct in our conclusions thus far, we think it must be held that the tax in question so discriminates. It appears plausible that the State of Ohio, wherein plaintiff's business was largely conducted, and where a portion of the transactions were had giving rise to the income received, could impose a similar tax, and more certain that the State of Pennsylvania, where the income was actually received, could do likewise. In Gwin, White & Prince Inc. v. Henneford, supra, the court, in considering a situation similar to the instant one, on page 439 of 305 U.S., on page 328 of 59 S.Ct., 83 L. Ed. 272, said: "* * * If Washington is free to exact such a tax, other states to which the commerce extends may, with equal right, lay a tax similarly measured for the privilege of conducting within their respective territorial limits the activities there which contribute to the service. * * *"

It is our conclusion, therefore, that the tax in question discriminates against interstate commerce, and for that reason is void. Adams Mfg. Co. v. Storen, supra.

The judgment of the District Court is reversed.

**930**

LINDLEY, District Judge (dissenting).

The Indiana statute imposes a tax upon the gross income of all residents of the state and upon the gross income, "derived from sources within the state," of non-residents engaged in business in the state or "who derive gross income from sources within the state." Here the income sought to be taxed arose from the delivery in Indiana by the seller to the buyer of railroad ties produced in Indiana, in pursuance of orders received from outside the state. Title passed from the seller to the purchaser upon delivery within Indiana and the income received by the seller arose solely from sources within the state. The tax is clearly assessable under the statute unless it is a discrimination against or constitutes a burden upon interstate commerce.

A non-discriminatory tax upon articles eventually destined for interstate commerce, even though ordered from without the state, where the transaction is completed within the state, does not, it seems to me, under the decisions of the Supreme Court, amount to undue discrimination against, interference with, or burden upon, interstate commerce.

I have fully stated my reasons for this conclusion in my dissent in Re Globe Varnish Co. (Nudelman v. Globe Varnish Company), 7 Cir., 114 F.2d 916. As said there, the question presented is not one of the power or extent of the power of the Congress to regulate interstate commerce. Rather, it is a question of whether a tax upon income, clearly derived from sources within the state, constitutes discrimination against interstate commerce even though measured by the same yardstick as the tax upon income of residents —whether it is removed from the non-discriminatory category by the fact that the articles are intended eventually to pass into interstate commerce. An affirmative conclusion, it is my conviction, is not justified under the decisions of the Supreme Court.

The doctrine of apportionment is in no wise applicable. The income involved arose entirely from sources within the state. Hence there is nothing to apportion between Indiana and other states.

I think the judgment should be affirmed.