377 U.S. 436 (1964)
GENERAL MOTORS CORP.
v.
WASHINGTON ET AL.
No. 115.
Supreme Court of United States.
Argued February 26, 1964.
Decided June 8, 1964.
APPEAL FROM THE SUPREME COURT OF WASHINGTON.
*437 Donald K. Barnes argued the cause for appellant. With him on the briefs were Aloysius F. Power, Thomas J. Hughes and Dewitt Williams.
John W. Riley, Special Assistant Attorney General of Washington, and Timothy R. Malone, Assistant Attorney General, argued the cause for appellees. With them on the brief were John J. O'Connell, Attorney General of Washington, and James A. Furber and Lloyd W. Peterson, Assistant Attorneys General.
MR. JUSTICE CLARK delivered the opinion of the Court.
This appeal tests the constitutional validity, under the Commerce and Due Process Clauses, of Washington's tax imposed upon the privilege of engaging in business activities within the State.[1] The tax is measured by the *438 appellant's gross wholesale sales of motor vehicles, parts and accessories delivered in the State. Appellant claims that the tax is levied on unapportioned gross receipts from such sales and is, therefore, a tax on the privilege of engaging in interstate commerce; is inherently discriminatory; results in the imposition of a multiple tax burden; and is a deprivation of property without due process of law. The Washington Superior Court held that the presence of a branch office in Seattle rendered some of the Chevrolet transactions subject to tax, but, as to the remainder, held that the application of the statute would be repugnant to the Commerce and the Due Process Clauses of the United States Constitution. On appeal, the Supreme Court of Washington reversed the latter finding, holding that all of the appellant's transactions were subject *439 to the tax on the ground that the tax bore a reasonable relation to the appellant's activities within the State. 60 Wash. 2d 862, 376 P. 2d 843. Probable jurisdiction was noted. 374 U. S. 824. We have concluded that the tax is levied on the incidents of a substantial local business in Washington and is constitutionally valid and, therefore, affirm the judgment.

I.
We start with the proposition that "[i]t was not the purpose of the commerce clause to relieve those engaged in interstate commerce from their just share of state tax burden even though it increases the cost of doing the business." Western Live Stock v. Bureau of Revenue, 303 U. S. 250, 254 (1938). "Even interstate business must pay its way," Postal Telegraph-Cable Co. v. Richmond, 249 U. S. 252, 259 (1919), as is evidenced by numerous opinions of this Court. For example, the Court has approved property taxes on the instruments employed in commerce, Western Union Telegraph Co. v. Attorney General, 125 U. S. 530 (1888); on property devoted to interstate transportation fairly apportioned to its use within the State, Pullman's Palace Car Co. v. Pennsylvania, 141 U. S. 18 (1891); on profits derived from foreign or interstate commerce by way of a net income tax, William E. Peck & Co. v. Lowe, 247 U. S. 165 (1918), and United States Glue Co. v. Oak Creek, 247 U. S. 321 (1918); by franchise taxes, measured by the net income of a commercially domiciled corporation from interstate commerce attributable to business done in the State and fairly apportioned, Underwood Typewriter Co. v. Chamberlain, 254 U. S. 113 (1920); by a franchise tax measured on a proportional formula on profits of a unitary business manufacturing and selling ale, "the process of manufacturing resulting in no profits until it ends in sales," Bass, Ratcliff & Gretton, Ltd., v. State Tax Comm'n, 266 U. S. 271, 282 (1924); by a personal property *440 tax by a domiciliary State on a fleet of airplanes whose home port was in the taxing State, despite the fact that personal property taxes were paid on part of the fleet in other States, Northwest Airlines, Inc., v. Minnesota, 322 U. S. 292 (1944); by a net income tax on revenues derived from interstate commerce where fairly apportioned to business activities within the State, Northwestern States Portland Cement Co. v. Minnesota, 358 U. S. 450 (1959); and by a franchise tax levied on an express company, in lieu of taxes upon intangibles or rolling stock, measured by gross receipts, fairly apportioned, and derived from transportation within the State, Railway Express Agency, Inc., v. Virginia, 358 U. S. 434 (1959).
However, local taxes measured by gross receipts from interstate commerce have not always fared as well. Because every State has equal rights when taxing the commerce it touches, there exists the danger that such taxes can impose cumulative burdens upon interstate transactions which are not presented to local commerce. Cf. Michigan-Wisconsin Pipe Line Co. v. Calvert, 347 U. S. 157, 170 (1954); Philadelphia & Southern S. S. Co. v. Pennsylvania, 122 U. S. 326, 346 (1887). Such burdens would destroy interstate commerce and encourage the re-erection of those trade barriers which made the Commerce Clause necessary. Cf. Baldwin v. G. A. F. Seelig, Inc., 294 U. S. 511, 521-522 (1935). And in this connection, we have specifically held that interstate commerce cannot be subjected to the burden of "multiple taxation." Michigan-Wisconsin Pipe Line Co. v. Calvert, supra, at 170. Nevertheless, as we have seen, it is well established that taxation measured by gross receipts is constitutionally proper if it is fairly apportioned.
A careful analysis of the cases in this field teaches that the validity of the tax rests upon whether the State is exacting a constitutionally fair demand for that aspect of interstate commerce to which it bears a special relation. *441 For our purposes the decisive issue turns on the operating incidence of the tax. In other words, the question is whether the State has exerted its power in proper proportion to appellant's activities within the State and to appellant's consequent enjoyment of the opportunities and protections which the State has afforded. Where, as in the instant case, the taxing State is not the domiciliary State, we look to the taxpayer's business activities within the State, i. e., the local incidents, to determine if the gross receipts from sales therein may be fairly related to those activities. As was said in Wisconsin v. J. C. Penney Co., 311 U. S. 435, 444 (1940), "[t]he simple but controlling question is whether the state has given anything for which it can ask return."
Here it is admitted that General Motors has entered the State and engaged in activities therein. In fact, General Motors voluntarily pays considerable taxes on its Washington operations but contests the validity of the tax levy on four of its Divisions, Chevrolet, Pontiac, Oldsmobile and General Motors Parts. Under these circumstances appellant has the burden of showing that the operations of these divisions in the State are "dissociated from the local business and interstate in nature. The general rule, applicable here, is that a taxpayer claiming immunity from a tax has the burden of establishing his exemption." Norton Co. v. Department of Revenue, 340 U. S. 534, 537 (1951). And, as we also said in that case, this burden is not met
"by showing a fair difference of opinion which as an original matter might be decided differently. This corporation, by submitting itself to the taxing power . . . [of the State], likewise submitted itself to its judicial power to construe and apply its taxing statute insofar as it keeps within constitutional bounds. Of course, in constitutional cases, we have power to examine the whole record to arrive at an *442 independent judgment as to whether constitutional rights have been invaded, but that does not mean that we will re-examine, as a court of first instance, findings of fact supported by substantial evidence." At 537-538.
With these principles in mind, we turn to the facts.

II.

1. GENERAL MOTORS' CORPORATE ORGANIZATION AND SALES OPERATION.
General Motors is a Delaware corporation which was engaged in business in Washington during the period of time involved in this case, January 1, 1949, through June 30, 1953. Chevrolet, Pontiac, Oldsmobile and General Motors Parts are divisions of General Motors, but they operate substantially independently of each other. The corporation manufactures automobiles, trucks and other merchandise which are sold to dealers in Washington. However, all of these articles are manufactured in other States. In order to carry on the sale, in Washington, of the products of Chevrolet, Pontiac, Oldsmobile and General Motors Parts, the corporation maintains an organization of employees in each of these divisions on a national, regional and district level. During the taxing period in question, the State of Washington was located in the western region of the corporation's national organization and each division, except General Motors Parts, maintained a zone office at Portland, Oregon. These zone offices serviced General Motors' operations in Oregon, Washington, Idaho, portions of Montana and Wyoming and all of the then Territory of Alaska. Chevrolet Division also maintained a branch office at Seattle which was under the jurisdiction of the Portland zone office and which rendered special service to all except the nine southern counties of Washington, which were still serviced by the Portland office. The zone offices of each division *443 were broken down into geographical district offices and it is in these districts that the dealers, to whom the corporation sold its products for re-sale, were selected and located.[2] The orders for these products were sent by the dealers to the zone office located at Portland. They were accepted or rejected there or at the factory and the sales were completed by shipments f. o. b. the factories.

2. PERSONNEL RESIDING WITHIN THE STATE AND THEIR ACTIVITIES.
The sales organizations of the Chevrolet, Pontiac and Oldsmobile Divisions were similar in most respects. The zone manager was located in Portland and had charge of the sales operation. His job was "to secure and maintain a quality dealer organization . . . to administer and promote programs, plans and procedures that will cause that dealer organization to give . . . the best possible business representation in this area." R. 76. The district managers lived within the State of Washington and their jobs were "the maintenance of a quality organization dealer organizationand the follow-through and administration of programs, plans and procedures within their district, that will help to develop the dealer organization, for the best possible financial and sales results." R. 109. While he had no office within the State, the district manager operated from his home where he received mail and telephone calls and otherwise carried on the corporation's business. He called upon each dealer in his district on an average of at least once a month, and often saw the larger dealers weekly. A district manager had from 12 to 30 dealers under his supervision and functioned as the zone manager's direct contact *444 with these dealers, acting "in a supervisory or advisory capacity to see that they have the proper sales organization and to acquaint them with the Divisional sales policies and promotional and training plans to improve the selling ability of the sales organization." R. 246. In this connection, the district manager also assisted in the organization and training of the dealer's sales force. At appropriate times he distributed promotional material and advised on used car inventory control.
It was also the duty of the district manager to discuss and work out with the dealer the 30-, 60- and 90-day projection of orders of estimated needs which the dealer or the district manager then filed with the zone manager. These projections indicated the number of cars a dealer needed during the indicated period and also included estimates for accessories and equipment. The projected orders were prepared and filed each month and the estimates contained in them could, for all practical purposes, be "construed as a purchase order."[3]
In addition to the district manager, each of the Chevrolet, Pontiac and Oldsmobile Divisions also maintained service representatives who called on the dealers with regularity, assisting the service department in any troubles it experienced with General Motors products. These representatives also checked the adequacy of the service department inventory to make certain that the dealer's agreement was being complied with and to ensure the best possible service to customers. It was also their duty to note the appearance of the dealer's place of business *445 and, where needed, to require rehabilitation, improved cleanliness or any other repairs necessary to achieve an attractive sales and service facility. At the dealer's request, or on direction from his zone superior, the service representative also conducted service clinics at the dealer's place of business, for the purpose of teaching the dealer and his service personnel the proper techniques necessary to the operation of an efficient service department. The service representative also gave assistance to the dealer with the more difficult customer complaints, some of which were registered with the dealer, but others of which were registered with the corporation.
During the tax period involved here the Chevrolet, Oldsmobile and Pontiac Divisions had an average of about 20 employees resident or principally employed in Washington.[4] General Motors Parts Division employed about 20 more.
The Chevrolet Division's branch office at Seattle consisted of one man and his secretary. That office performed the function of getting better service for Washington dealers on orders of Chevrolet Division products. The branch office had no jurisdiction over sales or over other Chevrolet personnel in the State. Since January 1, 1954, Chevrolet Division has maintained a zone office in Seattle and has paid the tax without dispute.

3. OUT-OF-STATE PERSONNEL, PERFORMING IN-STATE ACTIVITIES.
The zone manager, who directed all zone activities, visited with each Washington dealer on the average of once each 60 days, the larger ones, each month. About one-half of these visits were staged at the dealer's place of business and the others were at Portland. The zone *446 business management manager was the efficiency expert for the zone and supervised the capital structure and financing of the Washington dealers. The zone parts and service manager held responsibility for the adequacy of the Washington dealer services to customers. He worked through the local Washington service representative, but also made personal visits to Washington dealers and conducted schools for the promotion of good service policies. The zone used car manager (for the Chevrolet Division only) assisted Washington dealers in the disposition of used cars through appropriate display and reconditioning.

4. ACTIVITIES OF GENERAL MOTORS PARTS DIVISION.
During the period of this tax, the General Motors Parts Division warehoused, sold and shipped parts and accessories to Washington dealers for Chevrolet, Pontiac and Oldsmobile vehicles. It maintained warehouses in Portland and Seattle. No personnel of this division visited the dealers, but all of the Chevrolet, Pontiac and Oldsmobile dealers in Washington obtained their parts and accessories from these warehouses. Items carried by the Seattle warehouse were shipped from it, and those warehoused at Portland were shipped from there. The Seattle warehouse, which carried the items most often called for in Washington, employed from 20 to 28 people during the taxing period. The Portland warehouse carried the less frequently needed parts. The tax on the orders filled at the Seattle warehouse was paid but the tax on the Portland shipments is being protested.

III.
"[I]t is beyond dispute," we said in Northwestern States Portland Cement Co. v. Minnesota, supra, at 458, "that a State may not lay a tax on the `privilege' of engaging in interstate commerce." But that is not this case. To so contend here is to overlook a long line of cases of *447 this Court holding that an in-state activity may be a sufficient local incident upon which a tax may be based. As was said in Spector Motor Service, Inc., v. O'Connor, 340 U. S. 602, 609 (1951), "[t]he State is not precluded from imposing taxes upon other activities or aspects of this [interstate] business which, unlike the privilege of doing interstate business, are subject to the sovereign power of the State." This is exactly what Washington seeks to do here and we cannot say that appellant has shown that its activities within the State are not such incidents as the State can reach. Norton Co. v. Department of Revenue, supra, at 537. Unlike Field Enterprises, Inc., v. Washington, 47 Wash. 2d 852, 289 P. 2d 1010, aff'd, 352 U. S. 806 (1956), citing Norton, supra, the Pontiac and Oldsmobile Divisions of General Motors had no branch offices in Washington. But these divisions had district managers, service representatives and other employees who were residents of the State and who performed substantial services in relation to General Motors' functions therein, particularly with relation to the establishment and maintenance of sales, upon which the tax was measured. We place little weight on the fact that these divisions had no formal offices in the State, since in actuality the homes of these officials were used as corporate offices. Despite their label as "homes" they served the corporation just as effectively as "offices." In addition, the corporation had a Chevrolet branch office and a General Motors Parts Division warehouse in Seattle.
Thus, in the bundle of corporate activity, which is the test here, we see General Motors' activity so enmeshed in local connections that it voluntarily paid taxes on various of its operations but insists that it was not liable on others. Since General Motors elected to enter the State in this fashion, we cannot say that the Supreme Court of Washington erred in holding that these local incidents were *448 sufficient to form the basis for the levy of a tax that would not run contrary to the Constitution. Norton Co. v. Department of Revenue, supra.

IV.
The tax that Washington levied is measured by the wholesale sales of the respective General Motors divisions in the State. It is unapportioned and, as we have pointed out, is, therefore, suspect. We must determine whether it is so closely related to the local activities of the corporation as to form "some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax." Miller Bros. Co. v. Maryland, 347 U. S. 340, 344-345 (1954). On the basis of the facts found by the state court we are not prepared to say that its conclusion was constitutionally impermissible. Norton Co. v. Department of Revenue, supra, at 538. Here, just as in Norton, the corporation so mingled its taxable business with that which it claims nontaxable that we can only "conclude that, in the light of all the evidence, the judgment attributing . . . [the corporation's Washington sales to its local activity] was within the realm of permissible judgment. Petitioner has not established that such services as were rendered . . . [through instate activity] were not decisive factors in establishing and holding this market." Ibid. Although mere entry into a State does not take from a corporation the right to continue to do an interstate business with tax immunity, it does not follow that the corporation can channel its operations through such a maze of local connections as does General Motors, and take advantage of its gain on domesticity, and still maintain that same degree of immunity.

V.
A more difficult question might arise from appellant's claim of multiple taxation. Gwin, White & Prince, Inc., v. Henneford, 305 U. S. 434, 440 (1939). General Motors *449 claims that some of its products taxed by Washington are manufactured in St. Louis where a license tax, measured by sales before shipment, is levied. See American Mfg. Co. v. St. Louis, 250 U. S. 459 (1919). It is also urged that General Motors' Oregon-based activity which concerns Washington sales might afford sufficient incidents for a similar tax by Oregon. The Court touched upon the problem of multiple taxation in Northwest Airlines v. Minnesota, supra, at 295, but laid it to one side as "not now before us." Thereafter, in Northwestern States Portland Cement Co. v. Minnesota, supra, at 463, we held that "[i]n this type of case the taxpayers must show that the formula places a burden upon interstate commerce in a constitutional sense." Appellant has not done this. It has not demonstrated what definite burden, in a constitutional sense, the St. Louis tax places on the identical interstate shipments by which Washington measures its tax. Cf. International Harvester Co. v. Evatt, 329 U. S. 416, 421-423 (1947). And further, it has not been shown that Oregon levies any tax on appellant's activity bearing on Washington sales. In such cases we have refrained from passing on the question of "multiple taxation," e. g., Northwestern States Portland Cement Co. v. Minnesota, supra, and we adhere to that position.
Affirmed.
MR. JUSTICE BRENNAN, dissenting.
This case presents once again the thorny problem of the power of a State to tax the gross receipts from interstate sales arising from activities occurring only partly within its borders. In upholding the Washington gross receipts tax the Court has, in my judgment, confused two quite different issues raised by the case, and in doing so has ignored a fatal defect in the Washington statute.
In order to tax any transaction, the Due Process Clause requires that a State show a sufficient "nexus between *450 such a tax and transactions within a state for which the tax is an exaction." Northwestern States Portland Cement Co., v. Minnesota, 358 U. S. 450, 464. This question, which we considered in McLeod v. J. E. Dilworth Co., 322 U. S. 327, and Norton Co. v. Department of Revenue, 340 U. S. 534, is the most fundamental precondition on state power to tax. But the strictures of the Constitution on this power do not stop there. For in the case of a gross receipts tax imposed upon an interstate transaction, even though the taxing State can show "some minimum connection," Northwestern States Portland Cement Co., supra, at 465, the Commerce Clause requires that "taxation measured by gross receipts from interstate commerce . . . [be] fairly apportioned to the commerce carried on within the taxing state." Western Live Stock v. Bureau of Revenue, 303 U. S. 250, 256. See J. D. Adams Mfg. Co. v. Storen, 304 U. S. 307.
The Court recognizes that "taxation measured by gross receipts is constitutionally proper if it is fairly apportioned," ante, p. 440. In concluding that the tax in this case includes a fair apportionment, however, the Court relies upon the fact that Washington has sufficient contacts with the sale to satisfy the Norton standard, which was formulated to meet the quite different problem of defining the requirements of the Due Process Clause. See Part IV, ante. Our prior decisions clearly indicate that a quite different scheme of apportionment is required. Of course, when a sale may be localized completely in one State, there is no danger of multiple taxation, and, as in the case of a retail sales tax, the State may use as its tax base the total gross receipts arising within its borders. See McGoldrick v. Berwind-White Coal Mining Co., 309 U. S. 33. But far more common in our complex economy is the kind of sale presented in this case, which exhibits significant contacts with more than one State. In such a situation, it is the commercial *451 activity within the State, and not the sales volume, which determines the State's power to tax, and by which the tax must be apportioned. While the ratio of in-state to out-of-state sales is often taken into account as one factor among others in apportioning a firm's total net income, see, e. g., the description of the "Massachusetts Formula" in Note, 75 Harv. L. Rev. 953, 1011 (1962), it nevertheless remains true that if commercial activity in more than one State results in a sale in one of them, that State may not claim as all its own the gross receipts to which the activity within its borders has contributed only a part. Such a tax must be apportioned to reflect the business activity within the taxing State. Cf. my concurring opinion in Railway Express Agency v. Virginia, 358 U. S. 434, 446. Since the Washington tax on wholesales is, by its very terms, applied to the "gross proceeds of sales" of those "engaging within this state in the business of making sales at wholesale," Rev. Code Wash. 82.04.270, it cannot be sustained under the standards required by the Commerce Clause.
MR. JUSTICE GOLDBERG, with whom MR. JUSTICE STEWART and MR. JUSTICE WHITE join, dissenting.
The issue presented is whether the Commerce Clause permits a State to assess an unapportioned gross receipts tax on the interstate wholesale sales of automobiles delivered to dealers for resale in that State. In upholding the tax involved in this case, the Court states as a general proposition that "taxation measured by gross receipts [from interstate sales] is constitutionally proper if it is fairly apportioned." Ante, at 440. The Court concludes from this that the validity of Washington's wholesale sales tax may be determined by asking " `the simple but controlling question [of] whether the state has given anything for which it can ask return.' " Ante, at 441. This elusively simple test and its application to this case represent *452 an important departure from a fundamental purpose of the Commerce Clause and from an established principle which had heretofore provided guidance in an area otherwise fraught with complexities and inconsistencies.
The relevant facts, which are undisputed, merit brief restatement. General Motors manufactures in California, Missouri and Michigan motor vehicles, parts and accessories which are sold at wholesale to independent dealers. The corporation manufactures none of these products within the State of Washington but does sell them to local Washington retail dealers. General Motors conducts business through "Divisions" which although not separately incorporated are operated as substantially independent entities. This case involves wholesale sales by the Chevrolet, Pontiac, Oldsmobile and General Motors Parts Divisions to independent dealers in Washington. As a general matter the sales and orders involved in this case were handled and approved by zone offices in Portland, Oregon. General Motors has a limited number of sales representatives ("district managers") who reside in Washington and who maintain contacts with the local dealers in order to facilitate the sales of General Motors products, but these sales representatives conducted no business in Washington other than the promotion of their wholesale interstate sales. The orders for automobiles were sent directly to the Portland zone offices where they were accepted for shipment, f. o. b., from points outside of Washington. For the purposes of this case, however, it is useful to divide the transactionsthe taxability of which is in disputeinto three categories:
(1) Pontiac and Oldsmobile Divisions Sales: These Divisions had no office, establishment or intrastate business in Washington; they operated entirely through Portland zone offices and the Washington sales representatives.

*453 (2) General Motors Parts Division Sales: This Division maintained warehouses in both Seattle, Washington, and Portland, Oregon. The Seattle warehouse sold directly to local Washington dealers and the tax imposed on such sales has been paid and is not disputed here. The sales to Washington dealers of parts and accessories ordered from and delivered by the Portland warehouse were, however, also taxed and those taxes are disputed here.
(3) Chevrolet Division Sales"Class A and B" Sales: The Chevrolet Division maintained a one-man branch office in Seattle, Washington; and all sales within the territorial jurisdiction of that office have been referred to in this litigation as "Class A" transactions. This one-man office operated under the direction of the Portland zone office and conducted no business in the State of Washington other than to facilitate the management and handling of sales and orders through the Portland zone office. The Seattle office, however, dealt only with Washington's northern counties and did not deal with nine of Washington's southern counties; the sales to dealers in those southern counties have been labeled "Class B" sales and had no connection with Chevrolet's Seattle office. The "Class B" sales were therefore similar to those in category (1) above.
All of the above transactions have been subjected to an unapportioned gross receipts tax which the State of Washington assesses for the privilege of "engaging within this state in the business of making sales at wholesale." Rev. Code Wash. 82.04.270; Wash. Laws 1949, c. 228, § 1 (e).[1]
*454 On these facts the Court holds that the activities of the sales representatives constitute "an in-state activity" forming "a sufficient local incident upon which a tax may be based." Ante, at 447. This decision departs from Norton Co. v. Department of Revenue, 340 U. S. 534, and adopts a test there rejected. Norton involved a Massachusetts corporation which operated "a branch office and warehouse" in Chicago, Illinois, from which it made "local sales at retail." Id., at 535. The Massachusetts corporation was admittedly engaging in intrastate business within Illinois and was making local sales concededly subject to taxation by the State. In addition to "over-the-counter" Chicago sales, the Massachusetts firm made two other types of sales to Illinois inhabitants: (1) Sales based on orders or shipments which at some point were routed through or utilized the Chicago outlet and (2) sales based on orders from Illinois inhabitants sent directly to Massachusetts and filled by direct shipment to the purchasers. The Illinois tax was imposed upon all receipts obtained by Norton from sales to Illinois residents regardless of whether those sales were associated or connected with the local office and warehouse which was conducting intrastate business. The Court stated that when, "as here, the corporation has gone into the State to do local business," the firm could be exempted from taxation on sales "only by" sustaining the burden of "showing that the particular transactions are dissociated from the local business and interstate in nature." Id., at 537. The Court held in part that "the judgment attributing to the Chicago branch income from all sales that utilized it either in receiving the orders or distributing the goods was within the realm of permissible judgment." Id., at 538. (Emphasis added.) But in spite of the burden of persuasion resting on a firm having an office doing intrastate business, the Court concluded that the tax on all sales by Norton to Illinois customers was *455 not wholly within "the realm of permissible judgment." The Court held that those sales involving goods and orders which proceeded directly from Massachusetts to the Illinois customers without becoming associated with the Chicago outlet were so clearly "interstate in character" that they could not be subjected to the Illinois tax. Id., at 539. In so holding the Court stated that the out-of-state corporation "could have approached the Illinois market through solicitors only and it would have been entitled to the immunity of interstate commerce . . . ." Id., at 538.
The facts and holdings of Norton should be compared with the facts and decision of the Court in the present case. The Norton decision surely requires immunity for the sales in category (1) (Pontiac and Oldsmobile Divisions Sales) for those sales were not only interstate in character but were wholly free from association with any local office or warehouse conducting intrastate business.
With respect to the transactions in category (2) (General Motors Parts Division Sales), it appears that the offices and warehouses operated by the Parts Division in Seattle, Washington, and in Portland, Oregon, create a situation strikingly similar to that in Norton where the Massachusetts firm maintained an outlet in Chicago, Illinois. Here as in Norton the Court is presented with an identifiable group of sales transactions (those involving sales at the local Seattle warehouse) which appear to have been over-the-counter and intrastate in character and with a readily distinguishable group of sales transactions (those involving only the Portland warehouse) which were not connected with an intrastate business and which were interstate in character. In Norton the latter type of purely interstate sales, those unconnected with any intrastate business, were squarely held nontaxable.
Finally, with respect to transactions in category (3) (Chevrolet Division Sales"Class A and B" Sales), *456 those in "Class B," which by definition lacked any connection with an in-state office, would seem to be precisely like those in Norton which had no connection with an in-state establishment and which accordingly were exempted. And, as to the "Class A" sales which were connected with the one-man Seattle office, it is important to note that this in-state "office," unlike the "office and warehouse" involved in Norton, made no intrastate or retail sales, stocked no products and had no authority to accept sales orders. In fact the Seattle "office" simply operated to facilitate the interstate sales directed by the zone office in Portland, Oregon.
Although the opinion of the Court seems to imply that there still is some threshold requirement of in-state activity which must be found to exist before a "fairly apportioned" tax may be imposed on interstate sales, it is difficult to conceive of a state gross receipts tax on interstate commerce which could not be sustained under the rationale adopted today. Every interstate sale invariably involves some local incidentssome "in-state" activity. It is difficult, for example, to distinguish between the in-state activities of the representatives here involved and the in-state activities of solicitors or traveling salesmen activities which this Court has held are insufficient to constitute a basis for imposing a tax on interstate sales. McLeod v. J. E. Dilworth Co., 322 U. S. 327; cf. Real Silk Hosiery Mills v. City of Portland, 268 U. S. 325; Robbins v. Shelby County Taxing District, 120 U. S. 489. Surely the distinction cannot rest on the fact that the solicitors or salesmen make hotels or motels their "offices" whereas in the present case the sales representatives made their homes their "offices." In this regard, the Norton decision rested solidly on the fact that the taxpayer had a branch office and warehouse making intrastate retail sales.
The opinion of the Court goes beyond a consideration of whether there has been in-state activity of appropriate *457 character to satisfy a threshold requirement for imposing a tax on interstate sales. The Court asserts as a general principle that the validity of a tax on interstate commerce "rests upon whether the State is exacting a constitutionally fair demand for that aspect of interstate commerce to which it bears a special relation." Ante, at 440. What is "fair"? How are we to determine whether a State has exerted its power in "proper proportion to appellant's activities within the State"? Ante, at 441. See Note, DevelopmentsFederal Limitations on State Taxation of Interstate Business, 75 Harv. L. Rev. 953, 957 (1962). I submit, with due respect for the complexity of the problem, that the formulation suggested by the Court is unworkable. Constitutional adjudication under the Commerce Clause would find little guidance in a concept of state interstate sales taxation tested and limited by the tax's "fair" proportion or degree. The attempt to determine the "fairness" of an interstate sales tax of a given percentage imposed on given activities in one State would be almost as unseemly as an attempt to determine whether that same tax was "fairly" apportioned in light of taxes levied on the same transaction by other States. The infinite variety of factual configurations would readily frustrate the usual process of clarification through judicial inclusion and exclusion. The only coherent pattern that could develop would, in reality, ultimately be based on a wholly permissive attitude toward state taxation of interstate commerce.
The dilemma inhering in the Court's formulation is revealed by its treatment of the "more difficult," but inextricably related, question arising from the alleged multiple taxation. The Court would avoid the basic question by saying that appellant "has not demonstrated what definite burden, in a constitutional sense, the St. Louis tax places on the identical interstate shipments . . . . And further, it has not been shown that Oregon levies *458 any tax on appellant's activity bearing on Washington sales."[2]Ante, at 449. These problems are engendered by the rule applied here and cannot be evaded. For if it is "fair" to subject the interstate sales to the Washington wholesale sales tax because of the activities of the sales representatives in Washington, then it would seem equally "fair" for Oregon, which is the site of the office directing and consummating these sales, to tax the same gross sales receipts. Moreover, it would seem "fairer" for California, Michigan or MissouriStates in which automobiles are manufactured, assembled or deliveredto impose a tax measured by, and effectively bearing upon, the same gross sales receipts. See Note, 38 Wash. L. Rev. 277, 281 (1963). Presumably, if there is to be a limitation on the taxing power of each of these States, that limitation surely cannot be on a first-come-first-tax basis. Alternatively, if diverse local incidents can afford bases for multistate taxation of the same interstate sale, then the Court is left to determine, out of some hypothetical maximum taxable amount, which proportion is "fair" for each of *459 the States having a sufficient "in-state" contact with the interstate transaction.
The burden on interstate commerce and the dangers of multiple taxation are made apparent by considering Washington's tax provisions. The Washington provision here involvedthe "tax on wholesalers"provides that every person "engaging within this state in the business of making sales at wholesale" shall pay a tax on such business "equal to the gross proceeds of sales of such business multiplied by the rate of one-quarter of one percent." Rev. Code Wash. 82.04.270; Wash. Laws 1949, c. 228, § 1 (e).[3] In the same chapter Washington imposes a "tax on manufacturers" which similarly provides that every person "engaging within this state in business as a manufacturer" shall pay a tax on such business "equal to the value of the products . . . manufactured, multiplied by the rate of one-quarter of one per cent." Rev. Code Wash. 82.04.240; Wash. Laws 1949, c. 228, § 1 (b). Then in a provision entitled "Persons taxable on multiple activities" the statute endeavors to insure that local Washington products will not be subjected both to the "tax on manufacturers" and to the "tax on wholesalers." Rev. Code Wash. 82.04.440; Wash. Laws 1949, c. 228, § 2-A. Prior to its amendment in 1950 the exemptive terms of this "multiple activities" provision were designed so that a Washington manufacturer-wholesaler would pay the manufacturing tax and be exempt from the wholesale tax. This provision, on its face, discriminated against interstate wholesale sales to Washington purchasers for it exempted the intrastate sales of locally made products while taxing the competing sales of interstate sellers. In 1950, however, the "multiple activities" provision was amended, reversing the tax and the exemption, so that a Washington manufacturer-wholesaler would first be subjected *460 to the wholesale tax and then, to the extent that he is taxed thereunder, exempted from the manufacturing tax. Rev. Code Wash. 82.04.440; Wash. Laws 1950 (special session), c. 5, § 2. See McDonnell & McDonnell v. State, 62 Wash. 2d 553, 557, 383 P. 2d 905, 908. This amended provision would seem to have essentially the same economic effect on interstate sales but has the advantage of appearing nondiscriminatory.
Even under the amended "multiple activities" exemption, however, an out-of-state firm manufacturing goods in a State having the same taxation provisions as does Washington would be subjected to two taxes on interstate sales to Washington customers. The firm would pay the producing State a local manufacturing tax measured by sales receipts and would also pay Washington a tax on wholesale sales to Washington residents. Under such taxation programs, if an out-of-state manufacturer competes with a Washington manufacturer, the out-of-state manufacturer may be seriously disadvantaged by the duplicative taxation. Even if the out-of-state firm has no Washington competitors, the imposition of interstate sales taxes, which add to the cost of producing, may diminish the demand for the product in Washington and thus affect the allocation of resources in the national economy. Moreover, the threat of duplicative taxation, even where there is no competitor manufacturing in the consuming State, may compel the out-of-state producer to relocate his manufacturing operations to avoid multiple taxation. Thus taxes such as the one upheld today may discourage the development of multistate business operations and the most advantageous distribution of our national resources; the economic effect inhibits the realization of a free and open economy unencumbered by local tariffs and protective devices. As the Court said in McLeod v. J. E. Dilworth Co., 322 U. S., at 330-331: "The very purpose of the Commerce Clause was to create an area of free *461 trade among the several States. That clause vested the power of taxing a transaction forming an unbroken process of interstate commerce in the Congress, not in the States."
It may be urged that the Washington tax should be upheld because it taxes in a nondiscriminatory fashion all wholesale sales, intrastate and interstate, to Washington purchasers. The Commerce Clause, however, was designed, as Mr. Justice Jackson said in H. P. Hood & Sons, Inc., v. Du Mond, 336 U. S. 525, 538, to create a "federal free trade unit"a common national market among the States; and the Constitution thereby precludes a State from defending a tax on interstate sales on the ground that the State taxes intrastate sales generally. Nondiscrimination alone is no basis for burdening the flow of interstate commerce. The Commerce Clause "does not merely forbid a State to single out interstate commerce for hostile action. A State is also precluded from taking any action which may fairly be deemed to have the effect of impeding the free flow of trade between States. It is immaterial that local commerce is subjected to a similar encumbrance." Freeman v. Hewit, 329 U. S., at 252. A State therefore should not be enabled to put out-of-state producers and merchants at a disadvantage by imposing a tax to "equalize" their costs with those of local businessmen who would otherwise suffer a competitive disadvantage because of the State's own taxation scheme. The disadvantage stemming from the wholesale sales tax was created by the State itself and therefore the fact that the State simultaneously imposes the same tax on interstate and intrastate transactions should not obscure the fact that interstate commerce is being burdened in order to protect the local market.[4]
*462 In my view the rules set forth in Norton Co. v. Department of Revenue, supra, reflect an attempt to adhere to the basic purposes of the Commerce Clause. Therefore, in dealing with unapportioned taxes on interstate sales, I would adhere to the Norton rules instead of departing from them by adopting a standard of "fairness." I would hold that a manufacturer or wholesaler making interstate sales is not subject to a state gross receipts tax merely because those sales were solicited or processed by agents living or traveling in the taxing State. As Norton recognized, a different rule may be applied to the taxation of sales substantially connected with an office or warehouse making intrastate sales. The test adopted by the Court today, if followed logically in future cases, would seem to mean that States will be permitted to tax wholly interstate sales by any company selling through local agents or traveling salesmen. Such a rule may leave only mailorder houses free from state taxes on interstate sales. With full sympathy for the revenue needs of States, I believe there are other legitimate means of raising state revenues without undermining the common national market created by the Commerce Clause. I therefore respectfully dissent.
NOTES
[1] Relevant sections of the Washington statute as they were in force during the taxable period in this case, January 1, 1949, through June 30, 1953, are:

"Section 4. From and after the first day of May, 1935, there is hereby levied and there shall be collected from every person a tax for the act or privilege of engaging in business activities. Such tax shall be measured by the application of rates against value of products, gross proceeds of sales, or gross income of the business, as the case may be, as follows:
.....
"(e) Upon every person . . . engaging within this state in the business of making sales at wholesale; as to such persons the amount of tax with respect to such business shall be equal to the gross proceeds of sales of such business multiplied by the rate of one-quarter of one per cent;
.....
"Section 5. For the purposes of this title . . .
.....
"(e) The term `sale at wholesale' or `wholesale sale' means any sale of tangible personal property and any sale of or charge made for labor and services rendered in respect to real or personal property, which is not a sale at retail;
"(f) The term `gross proceeds of sales' means the value proceeding or accruing from the sale of tangible personal property and/or for services rendered without any deduction on account of the cost of property sold, the cost of materials used, labor costs, interest, discount paid, delivery costs, taxes, or any other expense whatsoever paid or accrued and without any deduction on account of losses." Laws of Wash., 1949, c. 228, at 814-819.
[2] The dealers are independent merchants, often financing themselves, owning their own facilities and paying for all products upon delivery.
[3] R. 341. A Chevrolet zone manager said that: "Once that projection and estimate has been made, and a meeting of minds between the district manager and the dealer, or his representative, arrived at, the dealer then places individual orders with us on a separate form for the merchandise. Those separate forms, of course, are to allow him to specifically specify color option, and things of that character." R. 124.
[4] At times, Pontiac had three, Oldsmobile six and Chevrolet 17 assigned personnel in the State.
[1] The tax periods involved in this case are from January 1, 1949, through June 30, 1953.
[2] With respect to the view that the application of the Commerce Clause depends upon the existence of actual, as distinguished from potential, multiple taxation, compare Freeman v. Hewit, 329 U. S. 249, 256: "It is suggested . . . that the validity of a gross sales tax should depend on whether another State has also sought to impose its burden on the transactions. If another State has taxed the same interstate transaction, the burdensome consequences to interstate trade are undeniable. But that, for the time being, only one State has taxed is irrelevant to the kind of freedom of trade which the Commerce Clause generated. The immunities implicit in the Commerce Clause and the potential taxing power of a State can hardly be made to depend, in the world of practical affairs, on the shifting incidence of the varying tax laws of the various States at a particular moment. Courts are not possessed of instruments of determination so delicate as to enable them to weigh the various factors in a complicated economic setting which, as to an isolated application of a State tax, might mitigate the obvious burden generally created by a direct tax on commerce."
[3] See note 1, supra.
[4] Cf. Baldwin v. G. A. F. Seelig, Inc., 294 U. S. 511, 523: "To give entrance to that excuse ["the economic welfare of the farmers or of any other class or classes" of local businessmen] would be to invite a speedy end of our national solidarity. The Constitution was framed under the dominion of a political philosophy less parochial in range. It was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division." See H. P. Hood & Sons, Inc., v. Du Mond, 336 U. S. 525, 532-539.